[No. B055499. Second Dist., Div. Four. Oct. 19, 1995.]

RUTH CISNEROS et al., Plaintiffs and Appellants, v.
U.D. REGISTRY, INC., et al., Defendants and Appellants.

**COUNSEL**

San Fernando Valley Neighborhood Legal Services, Inc., David Pallack, Western Center on Law and Poverty, Richard A. Rothschild, Legal Aid Foundation of Los Angeles, Paul E. Lee, Roderick T. Field and Doug Brown for Plaintiffs and Appellants.

Earl Lui as Amicus Curiae on behalf of Plaintiffs and Appellants.

Sumner B. Cotton, Harvey Saltz, Horvitz & Levy, Barry R. Levy and Lisa Perrochet for Defendants and Appellants.

## OPINION

**EPSTEIN, Acting P. J.**—This case involves a suit brought by nine low-income renters against defendants the U.D. Registry, Inc. (UDR) and its president Harvey Saltz for alleged violations of the state and federal statutes that govern the activities of consumer credit reporting and investigative agencies. Both sides appeal from a judgment granting relief to plaintiffs Ruth Cisneros and Rudine Pettus on their claim for failure to respond to a dispute request, but in favor of defendants in all other respects. We affirm in part, reverse in part, and remand for retrial on certain issues we shall specify.

### FACTUAL BACKGROUND

Defendant UDR gathers information regarding residential renters and sells that information to its subscribers, mainly landlords and their agents. The information comes from public records of unlawful detainers, forcible detainers, property damage cases, foreclosures, bankruptcies, and the like. UDR also solicits information from its subscribers, providing forms on which they are requested to describe each tenant, his or her treatment of the premises, and other behavior relevant to the tenancy. This information is then passed on to other subscribers screening applicants to fill a vacancy.

Although what UDR does is similar to the task of a conventional credit agency, there are significant differences. A credit agency's data typically comes from credit and loan documents which contain ample information to identify the person involved, such as Social Security number, driver's license number, previous addresses, and spouse's name. UDR relies primarily on court files which contain little identifying information, usually just a name and possibly an address. When a subscriber calls UDR to obtain a report on a prospective tenant, the operator brings up all the information contained in the computer under that name. In many instances, the information available to the operator is not sufficient to determine whether or not the prospective tenant about whom the inquiry is being made is tied to the information appearing on the screen. At the time the lawsuit was filed, the practice of UDR was that if the operator did not have sufficient information from which to determine a definite match, the operator told the subscriber what there was under the name, and suggested that the subscriber make

further inquiries to determine if it was the same person. This kind of match was known as a "possible." When a tenant requested disclosure of his or her file, UDR disclosed only the information definitely matched to the person making the request, not the information "possibly" related. UDR instructed its subscribers not to tell tenants or prospective tenants what UDR had reported.

A statute in effect at the time the lawsuit was brought prohibited the reporting of unlawful detainer actions where the person against whom the action was filed was "adjudged the prevailing party." ([Former] Civ. Code, § 1785.13, subd. (a)(4) (Stats. 1982, ch. 1127, § 4, p. 4064); see *U.D. Registry, Inc.* v. *State of California* (1995) 34 Cal.App.4th 107 [40 Cal.Rptr.2d 228].) In accordance with its interpretation of this statute, UDR reported all unlawful detainer actions resolved in any way other than by adjudication after trial or summary judgment for the defendant, including, in at least some instances, actions resolved by demurrer, dismissal for failure to prosecute, and settlement. These reports were noted, "not adjudicated as the prevailing party."

The factual circumstances underlying each plaintiffs' claims were separate and distinct, and we shall discuss them in detail in the portion of the opinion to which they pertain. In general, plaintiffs alleged that UDR violated the federal Fair Credit Reporting Act (15 U.S.C. §§ 1681-1681t) (FCRA), the California Consumer Credit Reporting Agencies Act (Civ. Code, § 1785.1 et seq.) (CCRAA), and the Investigative Consumer Reporting Agencies Act (Civ. Code, § 1786 et seq.) (ICRA) by: failing to maintain a public office where in-person disclosures of consumer files could be made, refusing to respond to requests for disclosure, failing to disclose all information in a consumer's file, reporting unlawful detainer cases in which the tenant was the prevailing party, failing to follow reasonable procedures to assure maximum possible accuracy of consumer records, failing to follow verification procedures for investigative reports, failing to respond or reinvestigate when disputes concerning the accuracy of information contained in consumer files were brought to its attention or demanding improper concessions from the consumer prior to reinvestigating, and failing to notify consumers of certain rights. Plaintiffs sought damages and injunctive relief. In addition, plaintiffs sought injunctive relief for violation of the Unfair Business Practices Act (Bus. & Prof. Code, § 17200 et seq.), and damages for negligent and intentional infliction of emotional distress. A demurrer was sustained without leave to amend to the Unfair Business Practices Act and negligent infliction of emotional distress claims.

PROCEEDINGS BELOW

The case was tried to the court, both sides having waived the right to jury trial. After plaintiffs' case was complete, defendants brought a motion for

judgment pursuant to section 631.8 of the Code of Civil Procedure. The court granted the motion as to the cause of action for intentional infliction of emotional distress in its entirety, and as to certain other individual claims.

The trial court ultimately found for defendants on all but two of the remaining claims. It granted judgment in favor of plaintiff Ruth Cisneros based on UDR's failure to formally respond to a consumer dispute letter as required by section 1785.16 of CCRAA. The court awarded her $250 for "pain and suffering." The court found for plaintiff Rudine Pettus on the same ground as Ms. Cisneros. It ruled that UDR should have responded to her letter outlining reasons why she should be deemed the prevailing party in the three unlawful detainers in which she was involved, even if it believed the dispute to be frivolous. The court awarded her $100 for "pain and suffering."

Defendant Saltz was found jointly liable with UDR for the damages awarded because he personally made the decision not to respond to Ms. Cisneros and Ms. Pettus.

Both sides sought attorney fees. Based on the split decision, the court awarded $40,000 to defendants and $12,500 to plaintiffs for a net award of $27,500 to defendants.

## ISSUES RAISED

Plaintiffs' appeal raises seven separate issues. First, they challenge the sustaining of the demurrer to their unfair business practices claim. Second, plaintiffs argue the trial court erred in ruling that UDR was not required to maintain a public office. Third, plaintiffs contend that a report in which plaintiff June Halsell was described as having damaged a rental property was an investigative consumer report, and even if it was not, UDR's failure to assure the accuracy of what was told by Ms. Halsell's former landlord about her treatment of the premises, or to reinvestigate a dispute raised by Ms. Halsell concerning the accuracy of the report, violated CCRAA and FCRA. Fourth, plaintiffs maintain that FCRA and CCRAA require UDR to disclose tenant files when asked to do so by the tenant's attorney. Fifth, plaintiffs assert that injunctive relief should have been granted to prohibit UDR from reporting "possibles" and to require it to disclose to tenants when a "possible" match had been found or discussed. Sixth, Quida Johnson appeals the judgment for UDR on her claim of failing to ensure maximum possible accuracy and refusal to correct inaccurate records. Seventh, the plaintiffs attack the award of attorney fees to UDR. Plaintiffs are supported in their appeal of the public office, attorney fees, and the unfair business practices issues by amicus curiae Consumers Union.

UDR and defendant Saltz cross-appeal, contending that UDR did not violate section 1785.16 of CCRAA when it disregarded the Cisneros and Pettus dispute letters, that those two plaintiffs should not have been awarded damages for "emotional distress" since it was not severe, that judgment was improperly rendered against defendant Saltz as an individual, and that plaintiffs should have been forced to elect between the federal and state statutory schemes. UDR also seeks a determination that it is not covered by FCRA.

DISCUSSION

I

Because of its pertinence to other issues, we address the last issue first—whether UDR is covered by FCRA. Some background about this statute is helpful to understanding the issues it presents in the context of this case. FCRA was enacted in 1969 because Congress found a "need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." (15 U.S.C. § 1681(a)(4).) Its stated purpose was "to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information in accordance with the requirements of this subchapter." (15 U.S.C. § 1681(b).)

FCRA covers consumer credit reporting agencies whether they prepare "consumer reports" or "investigative consumer reports." In contrast, when California enacted its own version of the act in 1975, it drew a distinction between "consumer credit reporting agencies" and "investigative consumer reporting agencies." The former were covered by CCRAA, the latter under ICRA. Because of this split, the definition of "consumer credit report" in CCRAA is not as broad as the definition under FCRA. (Compare Civ. Code, § 1785.3, subd. (c) with 15 U.S.C. § 1681a(d).)

In 1982, the California Legislature amended the definition of "consumer credit report" to expressly include "any written, oral, or other communication of any information by a consumer credit reporting agency bearing on a consumer's credit worthiness, credit standing, or credit capacity, which is used or is expected to be used . . . for the purpose of serving as a factor in establishing the consumer's eligibility for: . . . hiring of a dwelling unit . . . ." (Civ. Code, § 1785.3, subd. (c)(3) (Stats. 1982, ch. 1127, § 2).) The

definition of "consumer report" under the federal statute, on the other hand, has remained the same since its inception: "The term 'consumer report' means any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for (1) credit or insurance to be used primarily for personal, family, or household purposes, or (2) employment purposes, or (3) other purposes authorized under section 1681b of this title." (15 U.S.C. § 1681a(d).)

"Consumer reporting agencies" are defined in relation to their procurement of consumer reports: "The term 'consumer reporting agency' means any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers *for the purpose of furnishing consumer reports to third parties . . . .*" (15 U.S.C. § 1681a(f), italics added.) Thus, to be covered by the FCRA, an agency must collect information for the purpose of "furnishing consumer reports," which, under the federal definition, does not specifically include a report used to establish eligibility for "the hiring of a dwelling unit." Because of this omission, UDR argues that the federal law was not meant to apply to agencies which, like itself, gather information for the sole purpose of establishing eligibility for the hiring of dwelling units.

We do not agree that FCRA should be construed so narrowly. The statute's definition of "consumer report" was written broadly to include everything from information bearing on "credit standing" to information about "general reputation" and "personal characteristics." If this data is sought to establish either eligibility for "credit or insurance . . . for personal, family, or household purposes," "employment purposes," or "other purposes authorized under section 1681b of this title," FCRA applies.

Several federal courts have held or indicated that a report used to determine a consumer's eligibility to rent housing is a transaction involving "credit" to be used for "household purposes" under subdivision (d)(1) of section 1681a. (*Cotto* v. *Jenney* (D.Mass. 1989) 721 F.Supp. 5, 6-7; see also *Conley* v. *TRW Credit Data* (N.D.Ill. 1974) 381 F.Supp. 473, 473-474 [consumer challenged report used to deny rental housing]; *Alexander* v. *Moore & Associates, Inc.* (D. Hawaii 1982) 553 F.Supp. 948, 950-951 [same].) In *Cotto*, the court pointed out that landlords "seek the services provided by companies like [defendant] to assist them in determining if a

prospective tenant is a good risk vis-à-vis whether the tenant will timely pay its rent." (*Cotto* v. *Jenney, supra,* 721 F.Supp. at p. 6.) Like UDR, the defendant in *Cotto* "examines an individual's financial background by reporting prior incidents of non-payment of rent, . . . late payments of rent, bounced checks and court proceedings and judgments." (*Ibid.*) "It follows, therefore, that if [defendant] issues a report stating that a prospective tenant has fallen behind on its rent payments on a prior occasion—as apparently occurred in the present case—the landlord would certainly give pause before incurring a potential financial risk by allowing the would-be tenant to occupy the residence. It is in this sense that pursuant to the FCRA the report on [the tenant] relates to her 'credit worthiness.' " (*Id.* at pp. 6-7.)

In a similar vein, the Ninth Circuit has held that an agency which compiles information concerning consumers who write bad checks is covered by the Act, in part because "[u]nder the Federal Fair Credit Reporting Act's definition of a 'consumer report (15 U.S.C. § 1681a(d)) . . . a report of the previous issuance of an unpayable check bear[s] 'on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, [and] personal characteristics'. . . ." (*Greenway* v. *Information Dynamics, Ltd.* (9th Cir. 1975) 524 F.2d 1145, 1146, cert. den. (1976) 424 U.S. 936 [47 L.Ed.2d 344, 96 S.Ct. 1153]. This same conclusion was reached by the Fifth Circuit in *Estiverne* v. *Sak's Fifth Avenue* (5th Cir. 1993) 9 F.3d 1171, 1173.

Defendants argue at length that subdivision (d)(3) of 15 United States Code section 1681a should not be construed to apply. As noted, that catchall provision defines a consumer report in terms of its use in connection with "other purposes authorized under section 1681b of this title." Section 1681b of 15 United States Code restricts the circumstances under which a consumer reporting agency may permissibly divulge a consumer report, limiting its ability to disclose to those situations specifically enumerated in the statute "and no other." It, too, contains a catchall provision allowing disclosure "[t]o a person which [the agency] has reason to believe . . . otherwise has a legitimate business need for the information in connection with a business transaction involving the consumer." (15 U.S.C. § 1681b(3)(E).) As the authorities cited by defendants demonstrate, federal courts interpreting this provision have construed it to avoid wholesale dissemination of a consumer's files to anyone involved in any type of transaction with the consumer. (See, e.g., *Mone* v. *Dranow* (9th Cir. 1991) 945 F.2d 306, 308; *Ippolito* v. *WNS, Inc.* (7th Cir. 1988) 864 F.2d 440, 451; *Houghton* v. *New Jersey Mfrs. Ins. Co.* (3d Cir. 1986) 795 F.2d 1144, 1149.) But *Mone, Ippolito,* and *Houghton* involved defendants who obtained reports on adverse parties in litigation. None of the courts held that a landlord seeking to rent or lease an

apartment does not have a "legitimate business need" for a consumer report.[1] More to the point is the decision in *Estiverne* v. *Sak's Fifth Avenue, supra,* where the issue was whether a merchant seeking a credit report prior to honoring a check had a " 'legitimate business need for the information in connection with a business transaction involving the consumer.' " (9 F.3d at p. 1173.) The court held "that [the merchant's] obtaining of this report for the purpose of deciding whether to accept or reject a check in payment is a 'legitimate business need' " under both 1681a and 1681b. (9 F.3d at p. 1173.)

Our decision is further supported by the construction of the statute by the Federal Trade Commission (FTC), the federal agency specifically charged with its enforcement. (See 15 U.S.C. § 1681s(a).) In its commentary on FCRA, the FTC states that "[r]eports about rental characteristics (e.g., consumers' evictions, rental payment histories, treatment of premises) are consumer reports, because they relate to character, general reputation, personal characteristics, or mode of living. . . . [¶] A report used to determine whether to rent a residence to a consumer is a consumer report, because it is used for a business transaction that the consumer wishes to enter into for personal, family or household purposes." (16 C.F.R., pt. 600, appen., § 603(d), ¶¶ 4(G) and 6(F) (1995).) The FTC's interpretation is entitled to some deference. (*Lukhard* v. *Reed* (1987) 481 U.S. 368, 378-379 [95 L.Ed.2d 328, 338-339, 107 S.Ct. 1807]; *Chevron U.S.A.* v. *Natural Res. Def. Council.* (1984) 467 U.S. 837, 843-845 [81 L.Ed.2d 694, 703-705, 104 S.Ct. 2778].)[2]

Based on these federal authorities and our construction of 15 United States Code section 1681a, we conclude that UDR's activities pertinent to this appeal are within the ambit of the FCRA.

## II

In their claim for relief under the state Unfair Business Practices Act, plaintiffs contended that defendants violated that law by repeated violations of CCRAA, ICRA, and FCRA. A demurrer to this cause of action was sustained without leave to amend. It should not have been.

---

[1] If "legitimate business need" were to be construed as narrowly as UDR suggests, then its landlord subscribers would obtain a traditional credit report at their peril. (See *Estiverne* v. *Sak's Fifth Avenue, supra,* 9 F.3d 1171 [consumer sought to demonstrate that merchant's decision to seek report from consumer reporting agency prior to honoring his check violated FCRA and his right to privacy because it was not "a legitimate business purpose" under section 1681b]; *Mone* v. *Dranow, supra,* 945 F.2d at pp. 307-308 ["A consumer whose credit report is obtained for reasons other than those listed in [section 1681b] may recover actual and punitive damages and attorney's fees and costs from the user of such information."].)

[2] We note that both the Fifth Circuit in *Estiverne,* and the federal district court affirmed by the Ninth Circuit in *Greenway,* relied on the FTC's interpretation of the statute. (*Estiverne* v. *Sak's Fifth Avenue, supra,* 9 F.3d at p. 1173; *Greenway* v. *Information Dynamics, Ltd.* (D.Ariz. 1974) 399 F.Supp. 1092, 1095, affd., *supra,* 524 F.2d 1145.)

At the time the alleged acts occurred, section 17203 of the Business and Professions Code provided in relevant part: "Any person performing or proposing to perform an act of unfair competition within this state may be enjoined in any court of competent jurisdiction" and Business and Professions Code section 17200 defined "unfair competition" to mean "unlawful, unfair or fraudulent business practice . . . ."[3] (Stats. 1977, ch. 299, § 1.) Section 17204 allows actions for relief to be prosecuted "by any person acting for the interests of itself, its members or the general public." In *Barquis* v. *Merchants Collection Assn.* (1972) 7 Cal.3d 94 [101 Cal.Rptr. 745, 496 P.2d 817], the Supreme Court rejected an argument that the act should be limited to common law unfair competition cases where a business enterprise presented itself, or its merchandise, to the public in a deceptive manner so as to defraud consumers. "The language of section 3369 [the predecessor of section 17203] does not limit its coverage to such 'deceptive' practices, but instead explicitly extends to any 'unlawful, unfair *or* deceptive business practice'; the Legislature, in our view, intended by this sweeping language to permit tribunals to enjoin on-going wrongful business conduct in whatever context such activity might occur." (7 Cal.3d at p. 111, italics in original.) Referring to the amendment which added the word "unlawful" to the types of wrongful business conduct that could be enjoined, the court noted: " 'it is difficult to see any other purpose than to extend the meaning of unfair competition to anything that can properly be called a business practice and that at the same time is forbidden by law.' " (*Id.* at p. 113.) The court cited as instructive the case of *Diaz* v. *Kay-Dix Ranch* (1970) 9 Cal.App.3d 588 [88 Cal.Rptr. 443], in which the statute was applied to an action by agricultural workers to enjoin defendant farm owners from continuing the practice of knowingly employing illegal immigrants.

More recently, in *Farmers Ins. Exchange* v. *Superior Court* (1992) 2 Cal.4th 377 [6 Cal.Rptr.2d 487, 826 P.2d 730], the court adopted language set forth in the Attorney General's brief that " '[i]n essence, an action based on Business and Professions Code section 17200 to redress an unlawful business practice "borrows" violations of other laws and treats these violations, when committed pursuant to business activity, as unlawful practices independently actionable under section 17200 et seq. and subject to the distinct remedies provided thereunder." (2 Cal.4th at p. 383; accord, *Committee on Children's Television, Inc.* v. *General Foods Corp.* (1983) 35 Cal.3d 197, 209-210 [197 Cal.Rptr. 783, 673 P.2d 660] [" 'the section 17200 proscription of "unfair competition" is not restricted to deceptive or fraudulent conduct but extends to any *unlawful* business practice [citation]. The

---

[3]In 1992, Business and Professions Code section 17203 was amended to state: "Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction . . . ," and the word "any" was added to the above quoted portion of section 17200. (Stats. 1992, ch. 430, §§ 2, 3.)

Legislature apparently intended to permit courts to enjoin ongoing wrongful business conduct in whatever context such activity might occur.' "]; *People v. McKale* (1979) 25 Cal.3d 626, 632 [159 Cal.Rptr. 811, 602 P.2d 731] ["The eighth, ninth and tenth causes of action allege violation of the Mobilehome Parks Act and related sections of the Administrative Code. . . . Under *Barquis* such violations constitute unlawful business activities because they are by nature business practices and are forbidden by law."].)

In light of this clear direction from the Supreme Court, we conclude that the wrongful acts alleged in the complaint comprised both a violation of the credit reporting statutes and the Unfair Business Practices Act. The demurrer to this cause of action was improperly sustained.

Moreover, this was not harmless error even though plaintiffs were able to seek injunctive relief under the consumer credit statutes. In proving an unfair business practice violation, claimants are entitled to introduce evidence not only of practices which affect them individually, but also similar practices involving other members of the public who are not parties to the action. (*Perdue* v. *Crocker National Bank* (1985) 38 Cal.3d 913, 929 [216 Cal.Rptr. 345, 702 P.2d 503]; *Consumers Union of United States, Inc.* v. *Fisher Development, Inc.* (1989) 208 Cal.App.3d 1433, 1441-1442 [257 Cal.Rptr. 151]; *Hernandez* v. *Atlantic Finance Co.* (1980) 105 Cal.App.3d 65, 72 [164 Cal.Rptr. 279].) Without the unfair business practices claim, the trial court restricted the scope of the evidence introduced at trial to that directly relevant to each individual plaintiff. Consequently, the case must be remanded for retrial of this claim.

### III

■ The second issue raised by plaintiffs' appeal is whether UDR is required to have and maintain an office open to the public under either CCRAA or FCRA. At one time, UDR had such an office, but closed it due to threats made against its personnel. Now, when a tenant wishes to review his or her file in person, the tenant must make advance arrangements to meet UDR personnel either at its attorney's office or in some public place such as a restaurant.

Civil Code section 1785.10, a part of CCRAA, states that "[e]very consumer credit reporting agency shall, upon request and proper identification of any consumer, allow the consumer to visually inspect all files maintained regarding that consumer at the time of the request." Subdivision (b) adds: "Every consumer reporting agency, upon contact by a consumer by phone,

mail, or in person regarding information which may be contained in the agency files regarding that consumer, shall promptly advise the consumer . . . of the obligation of the agency to provide disclosure of the files in person, by mail, or by telephone pursuant to Section 1785.15 . . . . The disclosure shall be provided in the manner selected by the consumer . . . ." Subdivision (a) of section 1785.15 provides: "A consumer credit reporting agency shall supply files and information required under Section 1785.10 during normal business hours and on reasonable notice." Subdivision (b), at the time of the complaint and trial, stated: "Files maintained on a consumer shall be disclosed promptly as follows: (1) In person, . . . if he or she appears in person and furnishes proper identification." Although sections 1785.15 and 1785.10 have undergone extensive revision since the complaint was filed and the trial completed, we will confine ourselves to the law applicable at the time of the acts described in the complaint.[4]

Plaintiffs argue that UDR could not comply with Civil Code section 1785.10, subdivision (b)'s requirement of disclosure to consumers contacting it "by phone, mail, or in person" unless it had a public office. That is not so. Section 1785.10, subdivision (b) mandated a certain response to a consumer whether the initial contact is made in person, by phone, or by mail. It did not require the agency to make itself available for in-person contact.

Civil Code section 1785.10, subdivision (b)'s requirement that disclosure be made "in the manner selected by the consumer" provided a better rationale for plaintiffs' position, but it too fell short of mandating a public office. Read literally, it required only that the agency provide a means by which consumers could visually review their files in person. This UDR did by arranging to meet in public or at its attorney's office. It may be, as the trial court said, that the Legislature assumed credit agencies would have a publicly known street address, but it did not write that requirement into the statute in effect at the time of the complaint and trial. UDR complied with the literal requirements of Civil Code sections 1785.10, subdivision (b) and

---

[4]On appeal from a judgment granting or denying an injunction, the appellate court usually applies the law in effect at the time of its decision. (*Fisher* v. *City of Berkeley* (1984) 37 Cal.3d 644, 654, fn. 3 [209 Cal.Rptr. 682, 693 P.2d 261] affd. 475 U.S. 260 [89 L.Ed.2d 206, 106 S.Ct. 1045].) In this case, however, plaintiffs sought both injunctive relief and damages, as well as a determination that UDR was engaged in unfair business practices by violating existing law. Moreover, the record as developed is insufficient to enable us to determine whether UDR is in compliance with the amended statute. In this situation, the trial court is the proper court in which to seek relief based on changes in the law that have occurred since the date of entry of judgment. (See *Inmates of Sybil Brand Institute for Women* v. *County of Los Angeles* (1982) 130 Cal.App.3d 89, 112 [181 Cal.Rptr. 599].)

1785.15 by arranging to meet with tenants at a place other than its normal business offices.[5]

The Consumer's Union in its amicus curiae brief argues that UDR's procedures for in-person disclosure violate the CCRAA's express requirement that agencies disclose consumer files "promptly." (Civ. Code, § 1785.15, subd. (b).) This provision also requires "reasonable notice" to the agency. (*Id.*, § 1785.15, subd. (a).) As described in the statement of decision, UDR's practice was to call tenants back with information concerning where to meet for an in-person disclosure. There was no evidence describing how long this procedure took, or that suggested that in-person disclosure conducted at UDR's offices would take place with any more alacrity.

FCRA contains similar language. Subdivision (a) of 15 United States Code section 1681g states: "Every consumer reporting agency shall, upon request and proper identification of any consumer, clearly and accurately disclose to the consumer: [¶] (1) The nature and substance of all information (except medical information) in its files on the consumer at the time of the request." Section 1681h requires the agency to make the disclosure "during normal business hours and on reasonable notice." The federal statute also specifies that the required disclosure "shall be made to the consumer—[¶] (1) in person if he appears in person and furnishes proper identification . . . ." (15 U.S.C. § 1681h(b)(1).) The requirements of the federal statute also can be met by arranging for in-person visual inspection at a location separate from the agency's usual place of business. Plaintiffs point to commentary by the FTC on section 1681m as authority for a contrary position. That section applies to "users," not consumer reporting agencies. Under its provisions, when a user denies credit based on an adverse report, the user is to notify the consumer "and supply the name and address of the consumer reporting agency making the report." (15 U.S.C. § 1681m(a).) In its official commentary, the FTC has said that "[t]he 'section [1681m]' notice must include the consumer reporting agency's street address, not just a post office box address." (16 C.F.R., pt. 600, appen., § 615, ¶ 12 (1995).) But in its most recent revision of the comments made in response to criticism of this interpretation, the FTC explained: "Nothing in the comment precludes a user from including a post office address and a relevant street address in the [section 1681m] notice, *or from providing a specialized office of the consumer reporting agency as the address where inquiries (including*

---

[5]The same does not appear to be true under the amendments to CCRAA. Section 1785.15, subdivision (b) now provides: "Files maintained on a consumer shall be disclosed promptly as follows: (1) In person, at the location where the consumer credit reporting agency maintains the trained personnel required by subdivision (d) [to explain to the consumer the information furnished to him], if he or she appears in person and furnishes proper identification."

*in-person visits) can be made.*" (FTC Commentary, 55 Fed.Reg. 18804, 18808 (May 4, 1990), italics added.) So explained by the FTC itself, the commentary does not construe the statute to prohibit consumer reporting agencies from maintaining off-premises "specialized offices" for in-person disclosures.

## IV

■ We turn next to plaintiffs' claim that UDR's practice of soliciting written comments from its subscriber landlords concerning tenants' treatment of rental premises, then passing that information on to other subscribers, brings it under ICRA. The issue is significant because ICRA imposes stricter notice and verification requirements than CCRAA.[6]

The evidence showed that UDR sent forms to its subscribers asking them to report the manner in which the tenancy ended. The forms gave landlords the following examples of the kind of information being solicited: "Always paid rent late and then with NSF check. Changed jobs 7 times in 2 months. Vacated owing 3 months rent of $1200 . . . $800 damage, 2 broken windows, torn drapes, grease in carpets requiring replacement, broken light fixtures, took refrigerator belonging to apartment." UDR made no attempt to verify such information from the landlord, but simply logged it in as part of the tenant's file.

This type of information appeared on only one report involved in the present appeal. The UDR file disclosed to June Halsell contained under the heading "special info": "over $1,000 property damage—grease on walls and carpets; stove & oven ruined with substance melted in it; freezer door broken; garbage strewn on floors." Counsel for Ms. Halsell wrote to UDR stating that "[t]he information contained in that 'Special Info' section of your consumer report is untrue. There was no property damage caused by Ms. Halsell or anyone else connected with her tenancy. Although the freezer

---

[6]Subdivision (a)(3) of Civil Code section 1786.16, for example, contains the following requirement: "If an investigative consumer report is sought in connection with the hiring of a dwelling unit, as defined in subdivision (c) of Section 1940, the person procuring or causing the request to be made shall, not later than three days after the date on which the report was first requested, notify the consumer in writing that an investigative consumer report will be made regarding the consumer's character, general reputation, personal characteristics, and mode of living." And Civil Code section 1786.30 provides: "Whenever an investigative consumer reporting agency prepares an investigative consumer report, no adverse information in the report . . . may be included in a subsequent investigative consumer report unless such adverse information has been verified in the process of making such subsequent consumer report, or the adverse information was received within the three-month period preceding the date the subsequent report is furnished." To the same effect are sections 1681d and 1681*l* of title 15 of the United States Code.

door was broken, it was broken by the manager when he moved the refrigerator into the apartment. Ms. Halsell did not cause the stove or oven to be 'ruined with substance melted on it' as alleged, nor was there garbage thrown on the floors. If there was any grease on the wall, it may have been near the stove from cooking, however there was no more than caused by ordinary wear and tear." UDR did not respond to that letter.

UDR sought summary adjudication that it was not an investigative consumer reporting agency and that the reports obtained from landlords were not investigative consumer reports. The court initially denied the motion, finding that UDR "is an investigative consumer reporting agency, and its 'Landlord Comments' constitute investigative consumer reports subject to the provisions of Civil Code section 1786 et seq." After trial, the court reversed this preliminary finding. It made known its intention to rule in this manner at trial, and counsel contended that UDR would still be required by CCRAA and FCRA to assure the accuracy of the information and reinvestigate consumer disputes. But the court ruled that Ms. Halsell could not pursue such a claim because it had not been adequately pled in the complaint.

Ms. Halsell challenges both the finding that UDR is not an investigative consumer reporting agency and the ruling that she did not otherwise plead violation of CCRAA and FCRA.

ICRA defines "investigative consumer reporting agency" as "*any person who*, for monetary fees or dues, *regularly engages in whole or in part in the practice of assembling or evaluating* employment or insurance information, or *information relating to the hiring of dwelling units*, or any combination thereof, concerning consumers for personal, family, or household purposes, *for the purposes of furnishing investigative consumer reports to third parties, to be used with respect to consumers* for employment purposes or, insurance primarily for personal, family, or household purposes, or *for purposes relating to the hiring of dwelling units* . . . ." (Civ. Code, § 1786.2, subd. (d), italics added.)

It is undisputed that UDR regularly engages in the practice of assembling and evaluating information relating to the hiring of dwelling units. The issue is whether it does so for the purpose of furnishing "investigative consumer reports." Under the statutory definition, an "investigative consumer report" is "a consumer report in which information on a consumer's character, general reputation, personal characteristics, or mode of living is obtained through personal interviews with neighbors, friends, or associates of the consumer reported on, or others with whom he or she is acquainted or who

may have knowledge concerning any of these items of information." [7] (Civ. Code, § 1786.2, subd. (c).) UDR argues that the reports it assembles and disseminates are not "investigative consumer reports" because the information is not obtained through "personal interviews." There is merit to this contention. The landlords who submit the information do not obtain it through interviews but through personal observation of the premises. It therefore is not an investigative consumer report when prepared by the landlord.

Whether it becomes an investigative consumer report when transmitted from the landlord to UDR is a much closer question, but one that the precepts of statutory construction require we decide in UDR's favor. Statutes are to be construed in accordance with their plain language. Civil Code section 1786.2 by its literal terms applies only to information obtained through "personal" interviews. While the dictionary definition of "personal" includes "of or pertaining to a particular person," "private," and "concerning a particular individual and his intimate affairs" (American Heritage Dict. (2d ed. 1982) p. 925) in this context the word appears to mean "in person." UDR solicits the information from landlords by way of forms sent to the subscribers to UDR's service, and landlords respond in writing. While this may be a form of "interview," it is not a "personal interview." Since neither UDR nor the landlord obtains the information through personal interview, the reports do not meet the definition of "investigative consumer reports," and ICRA is not implicated.[8]

---

[7]FCRA includes a similar definition. "Investigative consumer report" is defined to mean "a consumer report or portion thereof in which information on a consumer's character, general reputation, personal characteristics, or mode of living is obtained through personal interviews with neighbors, friends, or associates of the consumer reported on or with others with whom he is acquainted or who may have knowledge concerning any such items of information." (15 U.S.C. § 1681a(e).) Both statutes exclude from the definition of investigative consumer report "specific factual information relating to a consumer's credit record or manner of obtaining credit obtained directly from a creditor of the consumer or from a consumer reporting agency when that information was obtained directly from a potential or existing creditor of the consumer or from the consumer." (Civ. Code, § 1786.2, subd. (c); see 15 U.S.C. § 1681a(e) ["However, such information shall not include specific factual information on a consumer's credit record obtained directly from a creditor of the consumer or from a consumer reporting agency when such information was obtained directly from a creditor of the consumer or from the consumer."].)

[8]We again find support for our determination in the FTC's interpretation of FCRA. Construing section 1681a(e) of title 15 of the United States Code, the FTC has said: "A consumer report that contains information on a consumer's 'character, general reputation, personal characteristics or mode of living' obtained through telephone interviews with third parties is an 'investigative consumer report,' because 'personal interviews' includes interviews conducted by telephone as well as in person." (16 C.F.R., pt. 600, appen., § 603(e), ¶ (4) (1995).) Significantly, the FTC omits investigations conducted through written reports.

But this does not end the inquiry. The information collected is added to the tenant files maintained by UDR and is used "as a factor in establishing the consumer's eligibility for . . . hiring of a dwelling unit," part of CCRAA's definition of "consumer credit report." (Civ. Code, § 1785.3, subd. (c); see also 15 U.S.C. § 1681a(d).) As a disseminator of consumer credit files, UDR had an obligation "[to] follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates" (Civ. Code, § 1785.14, subd. (b)), and to review and reinvestigate when disputes about the accuracy of the information are brought to its attention by the consumer (Civ. Code, § 1785.16). The same is true under FCRA. (See 15 U.S.C. § 1681e(b) ["Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."]; 15 U.S.C. § 1681i(a) ["If the completeness or accuracy of any item of information contained in his file is disputed by a consumer, and such dispute is directly conveyed to the consumer reporting agency by the consumer, the consumer reporting agency shall within a reasonable period of time reinvestigate and record the current status of that information unless it has reasonable grounds to believe that the dispute by the consumer is frivolous or irrelevant. If after such reinvestigation such information is found to be inaccurate or can no longer be verified, the consumer reporting agency shall promptly delete such information"].)

When Ms. Halsell attempted to go forward on her claim that UDR violated CCRAA and FCRA by failing to assure maximum possible accuracy of the information in her report and by failing to reinvestigate a disputed item, the trial court, reviewing paragraphs 20 and 21 of the second amended complaint, ruled that those claims had not been adequately pled. While it is true these paragraphs refer to an "investigative report" when discussing the specific facts relating to Ms. Halsell, the complaint also asserts that UDR failed to assure maximum possible accuracy of the information concerning the individual about whom their reports relate and failed to reinvestigate the completeness and accuracy of its files when disputed by a consumer. That was sufficient to raise the issue, even if Ms. Halsell was initially mistaken about the legal basis for her claims. Ms. Halsell should have been permitted to go forward with her claim that UDR failed to assure maximum possible accuracy in a consumer report and failed to reinvestigate a disputed item.

## V

The next issue raised by the appeal is whether UDR was required to disclose tenant files in response to a letter from the tenant's attorney. In

March of 1987, counsel for the Walkers wrote to UDR requesting disclosure of their file. At about the same time, counsel for Ms. Cisneros wrote to UDR requesting file disclosure.[9] UDR responded stating that it would not disclose any information directly to representatives of consumers.[10]

Subdivision (a) of Civil Code section 1785.10 provides: "Every consumer credit reporting agency shall, upon request and proper identification of any consumer, allow the consumer to visually inspect all files maintained regarding that consumer at the time of the request." Subdivision (b) of section 1785.15 adds: "Files maintained on a consumer shall be disclosed promptly as follows: . . . (2) By mail, if the consumer makes a written request with proper identification for a copy of the file or a decoded written version of that file to be sent to the consumer at a specified address. . . ." (See 15 U.S.C. §§ 1681b, 1681c.) The trial court ruled that a consumer could raise a dispute through a representative, but in order to obtain disclosure of a credit file in the first instance, the request had to come from the consumer. The court relied on section 1785.15, subdivision (e) which permits a consumer who seeks in-person disclosure to be "accompanied" by one other person of his or her choosing, but not to send a third party in his or her stead. The court reasoned that if a consumer could not authorize a representative to obtain in-person disclosure, the representative should be equally unable to obtain disclosure by mail. We affirm.

As previously noted, the privacy right of consumers was an express concern of Congress and the California Legislature in enacting the credit reporting statutes. (Civ. Code, § 1785.1, subd. (c); 15 U.S.C. § 1681(a)(4).) This purpose underlies numerous provisions of CCRAA. For example, section 1785.11 of the Civil Code strictly limits the circumstances under which consumer reports can be disseminated, and Civil Code section 1785.14 requires reporting agencies to "maintain reasonable procedures designed . . . to limit furnishing of consumer credit reports to the purposes listed under Section 1785.11." To that end, agencies must "require that prospective users of the information identify themselves, certify the purposes for which the information is sought and certify that the information will be used for no other purposes." (Civ. Code, § 1785.14, subd. (a).) In addition, "[e]very consumer credit reporting agency shall make a reasonable effort to verify the identity of a new prospective user and the uses certified by such prospective user prior to furnishing such user a consumer report." (*Ibid.*; 15 U.S.C. §§ 1681b, 1681c.)

---

[9]Plaintiff June Halsell also alleged that UDR ignored a disclosure request from her counsel. In its statement of decision, the trial court found the evidence undisputed that her file, in fact, had been transmitted to her. Ms. Halsell does not contest this finding.

[10]UDR did not dispute the identity of the persons requesting disclosure.

The Legislature's concern for the confidentiality of consumer reports is also shown by the procedures set out in section 1785.15 of the Civil Code to verify the identity of the consumer prior to making disclosure. For in-person disclosures, the consumer must appear and "furnish proper identification," any third party accompanying him or her "shall furnish reasonable identification," and the consumer must on request "furnish a written statement granting permission to the consumer credit reporting agency to discuss the consumer's file in such person's presence." (Civ. Code, § 1785.15, subds. (b)(1) and (e); see 15 U.S.C. § 1681h(b)(1) and (d).) Disclosure by telephone can be made only after "the consumer has made a written request, with proper identification for telephone disclosure."[11] (Civ. Code, § 1785.15, subd. (b)(3); see 15 U.S.C. § 1681h(b)(2).) In light of these safeguards designed to prevent dissemination to unauthorized persons, it would make little sense to interpret the statute as requiring disclosure whenever the agency receives a letter containing the bald assertion that the author represents the subject consumer.

We agree, therefore, that both FCRA and CCRAA contemplate that requests for disclosure come from the consumer personally rather than from his or her representative.[12] This does not work any substantial hardship on consumers. An attorney or third party representative can just as easily prepare a disclosure request for the consumer's signature as make the

---

[11]Section 1785.11 of the Civil Code, in listing the only circumstances under which an agency may furnish a consumer credit report, includes as one such circumstance, "[i]n accordance with the written instructions of the consumer to whom it relates." (Civ. Code, § 1785.11, subd. (a)(2); see 15 U.S.C. § 1681b(2).) Because that provision does not mandate that reports be made at the written instructions of the consumer, it is not directly relevant here. It is, however, a complete answer to UDR's contention that the credit reporting statutes forbade it to respond to plaintiffs' attorneys' requests. (See *A-1 Cr. and Assur.* v. *Trans Union Cr. Information* (E.D.Pa. 1988) 678 F.Supp. 1147, 1150 ["The [FCRA] allows, but does not mandate, that the consumer reporting agency disclose information under the circumstances enumerated in 15 U.S.C. § 1681b," one of the circumstances being "[i]n accordance with the written instructions of the consumer to whom it relates."].)

[12]The trial court properly found, and UDR apparently concedes, that dispute resolution is a different matter. Once disclosure has been made and the issue is the accuracy of the information contained in the report, a representative working on behalf of the consumer can convey the consumer's position on disputed information and the requirements of response and reinvestigation contained in section 1785.16 of the Civil Code and section 1681i of title 15 United States Code apply. (See, e.g., *Milbauer* v. *TRW, Inc.* (E.D.N.Y. 1989) 707 F.Supp. 92, 95 ["[C]onsumer reporting agencies such as TRW are not privileged to ignore a consumer's dispute simply because that dispute is submitted by a third party."]; *Pinner* v. *Schmidt* (E.D.La. 1985) 617 F.Supp. 342, 346-347, revd. in part on other grounds (5th Cir. 1986) 805 F.2d 1258 ["It is inconceivable to the Court that an attorney could not represent a consumer in [conveying a dispute to the consumer reporting agency], and the Court opines that requirements of direct communication elsewhere in the FCRA are intended only to protect the consumer by affording him a qualified confidentiality in the extensive information available from his credit files."].)

request for disclosure himself or herself. Moreover, as provided in subdivision (b)(2) of Civil Code section 1785.15, when the request is made by the consumer in writing for disclosure by mail, the consumer may ask that the files and information be sent to any "specified" address, and that may be the address for the consumer's attorney or other representative.[13]

## VI

UDR's records contained information that two unlawful detainer actions had been filed a day apart in 1985 against "Alice Arias." One involved plaintiff Alice Arias, the other involved a different individual with that name. When Ms. Arias requested disclosure of her file, the one in which she was definitely involved was disclosed to her, but not the other.

Similarly, UDR's files showed that "Quida Johnson" had been involved in two eviction actions filed in November of 1982 and February of 1983. When Ms. Johnson applied for subsidized housing, UDR reported those evictions as positively being hers. After obtaining disclosure of her file, Ms. Johnson protested that she was not the person involved in the disputes reported. She provided documentation showing a different address during the relevant time periods. Ultimately, UDR sent a letter stating "we have removed her identity from those cases" but that '[t]hose cases, however, will most likely continue to be reported in the event your client is inquired about, merely due to the similar name . . . ."

■ Plaintiffs sought an injunction preventing UDR from reporting "possibles," and requiring that it disclose to consumers all "possibles" about which reports were made, even if UDR conceded it was unsure if the consumer was the party involved in the case. By order dated June 22, 1989, summary adjudication was granted for plaintiffs on the following pertinent issues: "[¶] 2. Defendants cannot make a report about a consumer unless defendants have positively identified that consumer as the party involved in

---

[13]Attached to the letter written on behalf of Ms. Cisneros was an "Authorization" signed by her stating "I hereby authorize David Pallack . . . to be my representative, and do hereby give my authorization for release of all confidential and other information about me to David Pallack or other person associated with him, that may be contained in your file." Attached to the letter on behalf of the Walkers were similar authorizations which stated: "I hereby authorize your company/organization to release any and all information pertaining thereto [to] the Legal Aid Foundation of Los Angeles and its employees, including, but not limited to, all records and reports on file of any nature whatsoever. [¶] I further instruct that all correspondence, notices and papers involving my records be sent to said Legal Aid Foundation of Los Angeles at its address given above." Because the issue was neither raised in appellants' brief nor argued below, we do not decide whether the requests submitted on behalf of the Walkers or Ms. Cisneros were, in fact, requests for disclosure made by the consumer personally to be sent to a specified address.

the unlawful detainer or other action reported by the UDR; and [¶ 3. Defendants must disclose to consumers all cases about which defendants have made reports, even if defendants have made reports about the consumer when defendants are unsure that the consumer is the party involved in the case reported." According to the record, UDR ceased reporting possibles after it received the preliminary order. Subsequently, the trial court refused to grant injunctive relief, in part because "the evidence at trial [is] that since [the court's] order was made, UDR no longer reports or discusses 'possibles.' " Plaintiffs challenge this determination.

"The denial of an injunction is within the sound discretion of the trial court and will be upheld on appeal absent an abuse of discretion." (*Donald* v. *Cafe Royale, Inc.* (1990) 218 Cal.App.3d 168, 184 [266 Cal.Rptr. 804].) "A change in circumstances, rendering injunctive relief moot or unnecessary, justifies the denial of an injunction." (*Ibid.*) "An injunction should not be granted as punishment for past acts . . . ." (*Choice-In-Education League* v. *Los Angeles Unified School Dist.* (1993) 17 Cal.App.4th 415, 422 [21 Cal.Rptr.2d 303].) The injunctive remedy should not be exercised "in the absence of any evidence that the acts are likely to be repeated in the future." (*Mallon* v. *City of Long Beach* (1958) 164 Cal.App.2d 178, 190 [330 P.2d 423].) Injunctive relief can be denied where the defendant voluntarily discontinues the wrongful conduct. (*California Service Station etc. Assn.* v. *Union Oil Co.* ( 1991) 232 Cal.App.3d 44, 56 [283 Cal.Rptr. 279].)

In denying the injunction, the trial court took particular note of the evidence that since the preliminary order was made, UDR ceased reporting or discussing "possibles." Implicit in this is the determination that the acts are unlikely to recur, and that a permanent injunction would have no impact other than as a punishment for past acts. Plaintiffs present no basis for disturbing the trial court's ruling in this regard, and we affirm it.

## VII

■ Quida Johnson appeals from the determination in UDR's favor of her claims under CCRAA and FCRA. Ms. Johnson contended that UDR erroneously identified her as having been involved in two unlawful detainers, based solely on the similarity of her name and the name of the defendant in the unlawful detainer actions. When she sought to have UDR correct her file, UDR initially refused to reinvestigate unless she signed a form "authoriz-[ing] The U.D. Registry, Inc., and/or its agents and/or investigators to verify and otherwise investigate the above information and any other private or public information contained or possessed by any bank, savings institution, medical practitioner, employer, or any other private or governmental entity

as deemed necessary by the U.D. Registry, Inc." Later, UDR sent the letter which we have described, stating "we have removed her identity from those cases" but that "[t]hose cases, however, will most likely continue to be reported in the event your client is inquired about, merely due to the similar name . . . ."

The trial court agreed with plaintiff that an erroneous report had been made, but found that UDR was not liable because it "has developed and follows 'reasonable procedures to assure maximum possible accuracy' as that phrase is used in [Civil Code section] 1785.14." It found that UDR had not followed its procedures in the case of Ms. Johnson, noting that "something plainly went wrong in [that] case . . . ," but that UDR's refusal to reinvestigate was justified because Ms. Johnson had refused to sign the waiver. The court granted judgment in favor of defendants on both claims. We reverse.

CCRAA and FCRA require credit reporting agencies to reinvestigate information contained in the report whenever a dispute is conveyed by the consumer to the agency. (Civ. Code, § 1785.16; 15 U.S.C. § 1681i.) We hold that, as a matter of law, a consumer reporting agency's insistence that the consumer sign a form waiving all privacy rights to financial and medical information prior to reinvestigating an item in his or her file violates these statutes. It follows that the issue of whether UDR properly responded to Ms. Johnson's request for reinvestigation should have been resolved in her favor.

Turning to the erroneous report claim, the applicable law is found in the requirement of Civil Code section 1785.14, subdivision (b) that "reasonable procedures [be followed] to assure maximum possible accuracy of the information concerning the individual about whom the report relates," and the requirement of section 1785.16 that a consumer credit reporting agency "maintain reasonable procedures designed to prevent the reappearance in a consumer's file and in consumer credit reports of information that has been deleted pursuant to this section . . . ." (See 15 U.S.C. § 1681e(b).) UDR responds that neither CCRAA nor FCRA imposes strict liability on the credit agency for an erroneous report. Defendants misconstrue what is meant by "strict liability" in this context.

Under the statutes, a credit reporting agency must have in place reasonable procedures to ensure maximum possible accuracy *and follow them.* If it does, then the fact that it erroneously reported unfavorable information does not subject it to liability. (See, e.g., *Stewart* v. *Credit Bureau, Inc.* (D.C. Cir. 1984) 734 F.2d 47, 51-53 [236 App.D.C. 146]; *Hauser* v. *Equifax, Inc.* (8th Cir. 1979) 602 F.2d 811, 814-815; *Bryant* v. *TRW, Inc.* (E.D.Mich.

1980) 487 F.Supp. 1234, 1240, affd. (6th Cir. 1982) 689 F.2d 72.) If, on the other hand, it negligently fails to follow its own procedures, and as a consequence an individual is damaged by an inaccurate report, it is subject to liability. (*Stewart* v. *Credit Bureau, Inc.*, *supra*, 734 F.2d at p. 56 [holding that there was "a genuine issue of material fact as to whether [defendant] followed reasonable procedures to assure the accuracy of [*plaintiff's*] credit report" (italics added)]; *Jones* v. *Credit Bureau of Garden City, Inc.* (D.Kan. 1988) 703 F.Supp. 897, 902 [finding that plaintiff came forward with sufficient evidence to avoid summary judgment on a claim for failure to assure maximum possible accuracy when he established that defendant recorded inaccurate information in his file without verifying the address or social security number of the real debtor]; *Bryant* v. *TRW, Inc.*, *supra*, 487 F.Supp. at p. 1238 ["[T]he law is directed not at defendant's policies but at the actual procedure it followed in obtaining information and preparing the two mortgage reports *on plaintiff*." (Italics added.)].)

The issue here is whether UDR had procedures in place to assure that a positive identification would not be made between a person applying for a rental unit and a name appearing in an unlawful detainer on the strength of nothing more than a UDR employee's perception of the peculiarity of the name. Defendants did not dispute that Ms. Johnson was identified as having been involved in two unlawful detainers solely on the basis of her unusual first name. Instead, defendants sought to establish at trial, by examining voter registration and Department of Motor Vehicles rolls, that there was only one Quida Johnson in the area. In other words, they claim, if they had had adequate procedures in place, and had followed them, the same mistake would have been made. Such after-the-fact rationalization is of no consequence. To establish a defense based on these types of records, UDR needed to show that it had a procedure in place to examine such records *before* concluding that a particular name was unique, *and* that it followed such procedures prior to reporting that Quida Johnson was involved in two unlawful detainers. In the absence of such evidence, the fact that UDR had good identification procedures encompassing other situations and generally followed them, as the trial court found, was no defense to Ms. Johnson's claims.

Because we hold as a matter of law that UDR's response to Ms. Johnson's dispute letters was unreasonable, and its sole defense to the erroneous report claim inadequate, there is no need to retry liability. On remand, the sole issue on Ms. Johnson's claims will be damages.

## VIII

■ Because we reverse and remand for retrial on a number of issues, the determination of who is the prevailing party and the amount of attorney fees

to be awarded must be recalculated after further proceedings. CCRAA contains a provision by which the prevailing party, whether it be the consumer or the agency, is entitled to his or her attorney fees. (Civ. Code, § 1785.31, subd. (d).) FCRA permits attorney fees to the prevailing consumer only. (15 U.S.C. §§ 1681n, 1681o.) Plaintiffs seek a determination that attorney fees cannot be awarded to UDR under any circumstances on the ground that the California statute, granting recovery of attorney fees to whichever party prevails, is preempted by FCRA, which permits recovery by a prevailing consumer only.

In enacting FCRA, Congress did not attempt to reserve to itself all efforts to regulate the consumer reporting business. (See 15 U.S.C. § 1681t ["This subchapter does not annul, alter, affect, or exempt any person subject to the provisions of this subchapter from complying with the laws of any State with respect to the collection, distribution, or use of any information on consumers, except to the extent that those laws are inconsistent with any provision of this subchapter, and then only to the extent of the inconsistency."]; *Credit Data of Arizona, Inc.* v. *State of Ariz.* (9th Cir. 1979) 602 F.2d 195, 197.) California is not foreclosed from enacting greater protections for consumers injured by the activities of reporting agencies.

Nor is the Legislature's decision to include a two-way attorney fee provision barred. Under the supremacy clause, state law is preempted only if it "is in direct conflict with federal law such that compliance with both is impossible, or the state law is an obstacle to the accomplishment of the full purposes and objectives of Congress . . . ." (*Gomon* v. *TRW, Inc.* (1994) 28 Cal.App.4th 1161, 1173 [34 Cal.Rptr.2d 256]; accord, *Doyle* v. *Board of Supervisors* (1988) 197 Cal.App.3d 1358, 1363 [243 Cal.Rptr. 572].) The remedies afforded to injured consumers by CCRAA are not inconsistent with, but are in addition to, remedies provided by FCRA. Consumers bringing lawsuits against credit reporting agencies may choose to disregard the state law entirely and rely exclusively on the federal statute. In that case, the consumer would not be exposed to the risk of incurring the cost of the agency's attorney fees. It is only when the consumer seeks the benefit of the greater protections of California law that this possibility arises. California's decision to offer greater protection to the consumer in a statute that provides for attorney's fees to whichever side prevails does not conflict with federal law.

The same conclusion was reached in *Gomon* v. *TRW, Inc.*, *supra*, in which the court held that CCRAA attorney fee provision does not conflict with FCRA, "nor is it an obstacle to its purposes and objectives" because "[a] plaintiff is not precluded by the CCRAA from bringing suit under the FCRA.

A consumer may sue under the FCRA and avoid the risk of having to pay the defendant's attorney fees if he or she does not prevail." (28 Cal.App.4th at pp. 1173-1174.)

We find further support for this view in the FTC's official commentary on the FCRA's preemption provision. According to the FTC, "State law is pre-empted by the FCRA only when compliance with inconsistent State law would result in *violation of the FCRA*." (16 C.F.R., pt. 600, appen. § 622, ¶ 1 (1995) italics added). This interpretation "is based on an unequivocal statement in the principal report in the FCRA's legislative history by the Senate Committee on Banking and Currency that, under the pre-emption provision, 'no State law would be preempted unless compliance would involve a violation of Federal law.' S. Rep., 91-517, 91st Cong., 1st Sess. 8 (November 5, 1969)." (FTC Commentary, 55 Fed.Reg. 18804, 18808, *supra*.) Under this interpretation, "[a] State law requirement that an employer provide notice to a consumer before ordering a consumer report, or that a consumer reporting agency must provide the consumer with a written copy of his file, would not be pre-empted, because a party that complies with such provisions would not violate the FCRA." (16 C.F.R., pt. 600, appen. § 622, ¶ 2, *supra*.) If state law may impose additional requirements on credit reporting agencies, the state's provision of attorney fees to the party prevailing on a claim brought under its more restrictive statute is equally valid.

## IX

In its cross-appeal, UDR contends that plaintiffs Cisneros and Pettus should not have prevailed on their claim that UDR failed to respond to their dispute letters as required by the statute. Once again, some factual background is required for a full understanding of the parties' positions.

Plaintiff Vincent Loven was the defendant in an unlawful detainer action filed in December of 1985. The case was dismissed, and he remained in possession of the premises. Mr. Loven obtained a copy of his file from UDR. In a letter to UDR, Mr. Loven argued that he should be listed as the prevailing party because the landlord had wrongfully sought to evict him in order to move the landlord's son onto the premises. UDR replied, stating that it did not consider this a dispute as to the accuracy or completeness of its files, that it considered the request to be "frivolous or irrelevant," and that it would not investigate further.

Plaintiff Rudine Pettus was involved in three unlawful detainer actions. In one, she claims she withheld rent because of habitability violations. In another, she settled based on the landlord's agreement not to report the case

to any credit agency. The third was not pursued after more than five years on file and was subject to dismissal for failure to prosecute, although apparently it never was actually dismissed. All of these actions were part of her file at UDR, although UDR had not yet reported the contents of the file to any of its subscribers. After obtaining disclosure of her file, Ms. Pettus wrote to UDR through counsel, explaining why she should be deemed to be the prevailing party in each of those actions. UDR did not respond, because Ms. Pettus's counsel also represented plaintiff Vincent Loven, and UDR's position for not changing the file was similar to its reason for refusing to change Mr. Loven's file.

Ruth Cisneros was a defendant in three unlawful detainer actions involving the same landlord and the same premises. In each, the case was dismissed or settled and Ms. Cisneros retained possession of the premises. She moved in February of 1988 of her own accord. Counsel for Ms. Cisneros wrote to UDR, explaining that each unlawful detainer filed represented an attempt by the landlord to evict Ms. Cisneros without good cause as required under the lease including, on one occasion, a refusal to accept her proffer of rent. UDR did not respond to the dispute raised in the letter, for the same reason it had not responded to Ms. Pettus: its previous correspondence with the same attorney concerning Mr. Loven's file.

By order dated July 10, 1989, partially granting plaintiffs' motion for summary judgment, the court ruled that a tenant is adjudged the prevailing party in an unlawful detainer action if a demurrer is sustained without leave to amend or a dismissal is filed for failure to prosecute, but not if the landlord voluntarily dismisses or settles. In accordance with this ruling, the court found that plaintiffs Loven, Pettus, and Cisneros were not prevailing parties when their actions were dismissed by the landlord or settled. The trial court also ruled that even if their disputes were regarded by UDR as frivolous, a response was required by Civil Code section 1785.16.[14]

In its cross-appeal, UDR claims that no response was required because plaintiffs Cisneros and Pettus were not disputing the accuracy of their reports as much as the reportability of unlawful detainers in which they were not adjudged the prevailing party. By focusing narrowly on the kinds of unlawful detainers it can and cannot report, UDR overlooks its broader obligations under the statutes as a credit reporting agency. Both CCRAA and FCRA require "maximum possible" accuracy. (Civ. Code, § 1785.14, subd. (b); 15 U.S.C. § 1681e(b).) This means that a report violates the statutes when it is misleading or incomplete, even if it is technically accurate.

---

[14]The court found no corresponding requirement under FCRA, a determination which is not challenged by plaintiffs.

(*Koropoulos* v. *Credit Bureau, Inc.* (D.C. Cir. 1984) 734 F.2d 37, 40 [236 App.D.C. 136, 81 A.L.R.Fed. 187]; *Pinner* v. *Schmidt* (5th Cir. 1986) 805 F.2d 1258, 1262-1263.) In *Koropoulos,* the District of Columbia Circuit held that reporting that a consumer defaulted on a loan without also reporting that he subsequently paid the debt in full violated the FCRA. The court "d[id] not agree with the district court that section 1681e(b) makes a credit reporting agency liable for damages only if the report contains statements that are technically untrue. Congress did not limit the Act's mandate to reasonable procedures to assure only technical accuracy; to the contrary, the Act requires reasonable procedures to assure 'maximum accuracy.' The Act's self-stated purpose is 'to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit . . . in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information.' 15 U.S.C. § 1681e(b). Certainly reports containing factually correct information that nonetheless mislead their readers are neither maximally accurate nor fair to the consumer who is the subject of the reports." (*Koropoulos* v. *Credit Bureau, Inc., supra,* 734 F.2d at p. 40; accord, *Henson* v. *CSC Credit Services* (S.D.Ind. 1993) 830 F.Supp. 1204, 1207, revd. in part on other grounds (7th Cir. 1994) 29 F.3d 280 [adopting the *Koropoulos* test]; *Alexander* v. *Moore & Associates, Inc., supra,* 553 F.Supp. 948, 952 [finding that "section 1681e(b) of the Act, fairly read, would apply to consumer reports even though they may be technically accurate, if it is shown that such reports are not accurate to the maximum possible extent."].)

The Cisneros and Pettus letters raised not only the technical question of whether the unlawful detainers were reportable, but also whether it was proper to report them as nonprevailing parties in several unlawful detainer actions without explaining the circumstances. These plaintiffs were entitled to a response from UDR.

## X

■ Defendants contend that the trial court wrongly awarded Ms. Cisneros and Ms. Pettus a total of $350 for "pain and suffering" when there was no evidence to indicate that their "emotional distress" was severe. We infer from the amount of the awards that the distress was not severe. Ms. Cisneros and Ms. Pettus were clearly wronged by UDR, and the minimal amount awarded by the trial court can be justified as nominal damages. (See, e.g., *Russell* v. *Shelter Financial Services* (W.D.Mo. 1984) 604 F.Supp. 201, 203; *Boothe* v. *TRW Credit Data* (S.D.N.Y. 1982) 557 F.Supp. 66, 71-72.) Therefore, we need not and do not reach the issue of whether the award of

damages for pain and suffering under the CCRAA requires a higher level of severity than that shown by the record here.

## XI

 Defendants' contention that plaintiffs should be forced to elect remedies is based on a provision in CCRAA which states: "Any consumer credit reporting agency or user of information against whom an action brought pursuant to Section 1681n or 1681o of Title 15 of the United States Code is pending shall not be subject to suit for the same act or omission under Section 1785.31." (Civ. Code, § 1785.34, subd. (a).) The trial court ruled that this section "is intended to . . . apply to a circumstance where there is a prior action pending under the federal law, and someone brings a later action under the state law. I think that's the plain meaning of the statute." We agree with the trial court's assessment.

## XII

 Defendant Saltz cross-appeals from the portion of the order imposing personal liability on him for the failure to respond to the Cisneros and Pettus dispute letters. He argues that CCRAA imposes requirements only on "consumer credit reporting agencies," and he cannot be liable because he does not fit the statutory definition of the term. Although the trial court agreed that he was not an agency, it imposed liability because the evidence was "clear that it was defendant Saltz who made the decision that a response would not be made to the Cisneros and Pettus requests."

CCRAA defines "consumer credit reporting agency" as "any person who, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer credit reports to third parties . . . ." (Civ. Code, § 1785.3, subd. (d).) Although defendant Saltz is an officer and employee of UDR which is a consumer reporting agency, he is not, himself, an agency under the statute. There was no evidence that fees were paid to him personally as opposed to the corporation.

The question is whether an officer, director, or other agent of a corporation is jointly liable with the corporation when he or she personally directs the corporation to violate a statutory provision. It is a well-recognized principle of law that corporate officers and directors "are jointly liable with the corporation and may be joined as defendants if they personally directed or participated in the tortious conduct." (*Frances T.* v. *Village Green Owners*

*Assn.* (1986) 42 Cal.3d 490, 504 [229 Cal.Rptr. 456, 723 P.2d 573].) Our Supreme Court held in that case, "[d]irectors are liable to third persons injured by their own tortious conduct regardless of whether they acted on behalf of the corporation and regardless of whether the corporation is also liable. [Citations.] This liability does not depend on the same grounds as 'piercing the corporate veil,' on account of inadequate capitalization for instance, but rather on the officer or director's personal participation or specific authorization of the tortious act." (42 Cal.3d at p. 504.)

Thus, corporate officers and directors are personally liable for acts of the corporation that violate, for example, the antitrust laws if they participate in the actions or authorize them. (See, e.g., *Klein* v. *Oakland Raiders, Ltd.* (1989) 211 Cal.App.3d 67, 77 [259 Cal.Rptr. 149], and cases cited therein.) On the other hand, in *Doctors' Company* v. *Superior Court* (1989) 49 Cal.3d 39 [260 Cal.Rptr. 183, 775 P.2d 508], where the issue was whether a corporate agent could be liable for conspiring to violate a provision of the Insurance Code, the court held: "A cause of action for civil conspiracy may not arise, however, if the alleged conspirator, though a participant in the agreement underlying the injury, was not personally bound by the duty violated by the wrongdoing and was acting only as the agent or employee of the party who did have that duty. . . . [¶] In the present case, the only duty toward plaintiff claimed to have been breached as a result of the defendants' alleged conspiracy is the statutory duty to attempt 'in good faith to effectuate prompt, fair, and equitable settlement of claims in which liability has become reasonably clear' (§ 790.03(h)(5)). That duty is imposed by statute *solely* upon persons engaged in the business of insurance. (§ 790.01.) Because the noninsurer defendants are not subject to that duty and were acting merely as agents of the insurer 'and not as individuals for their individual advantage' [citation], 'they cannot be held accountable on a theory of conspiracy.' [Citation.]" (49 Cal.3d at pp. 44-45, italics in original.)

*Self-Insurers' Security Fund* v. *ESIS, Inc.* (1988) 204 Cal.App.3d 1148 [251 Cal.Rptr. 693] is to the same effect. In that case, the court held that a corporate officer could not be personally liable for violation of Labor Code section 3701, which imposes a penalty for failure to post security with the Director of the Department of Industrial Relations in the amount of the corporation's estimated workers' compensation liabilities.

We conclude that the determination of whether or not a corporate officer, director, or other agent is personally liable for directing the corporation to violate a statutory requirement depends on the terms of the statute and the nature of the duties imposed. Civil Code section 1785.16, the only provision with which we are concerned here, requires a *consumer reporting agency* to

respond to consumer disputes within five days after a determination has been made that the dispute is frivolous or irrelevant. This duty is imposed solely on the agency itself. The requirement is statutory. There is no similar duty under common law. We conclude, therefore, that a consumer reporting agency's officer is not liable for the failure of the agency to make a formal response to a consumer complaint. Whether a corporate officer, director, or other agent may be personally liable when he or she directs or participates in the violation of other specific provisions of FCRA, CCRAA, or ICRA is an issue that is not before us, and we express no opinion concerning it.

### DISPOSITION

The case is reversed and remanded for retrial of plaintiffs' claims under the Unfair Business Practices Act, plaintiff June Halsell's claims that UDR failed to assure maximum possible accuracy of her consumer report and failed to reinvestigate a disputed item, plaintiff Quida Johnson's damages, and attorney fees. Each side is to bear its own costs.

Vogel (C. S.), J., and Hastings, J., concurred.

A petition for a rehearing was denied November 15, 1995.