Filed 11/12/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| SHELLEY COOPER, | B257664 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YS022645) |
| v. | |
| ERIC BETTINGER, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles, Armando Paz, Temporary Judge. (Pursuant to Cal. Const., art. VI, § 21.) Reversed and remanded.

Casselman Law Offices, Gary S. Casselman for Defendant and Appellant.

Law Office of Bruce Adelstein and Bruce Adelstein for Plaintiff and Respondent.

_____

## SUMMARY

Eric Bettinger appeals from an order renewing a civil harassment restraining order against him under section 527.6, subdivision (j), of Code of Civil Procedure.[1] We reverse and remand.

## FACTUAL AND PROCEDURAL BACKGROUND

After forty years without any contact or communication between them, Bettinger initiated a series of unreciprocated contacts with Shelley Cooper, a childhood neighbor and junior high classmate with whom he had minimal contact from 1968 to 1970. Cooper is a jewelry designer and owns a jewelry store in Gardena with an online Web site and occasionally appears in vendor videos on an internet marketing site selling her jewelry.

At the end of 2010, Bettinger sent a letter to Cooper at her store, congratulating her on her career and success and telling her "I would like to talk to you again. You were my friend for many years and to this day I still think of you every March 24"—Cooper's birthday. Bettinger then told Cooper that he fixed cars in Marina Del Rey and provided his work and home phone numbers, but told Cooper "I don't own a cell phone. I don't have e-mail, but I do have a meteorite I'd like you to look at. Please give me a call." He closed the letter with "Your old friend, Eric." Cooper did not call Bettinger.

About two months later, Bettinger sent a letter dated March 3, 2011—not to Cooper—but to "any staff member" at Cooper's store along with $20 "for a few minutes" of the person's time. It starts by stating: "This letter is for the person that saw Shelley's anger on Wednesday, Jan. 5 when she got a letter from me.[2] . . . What I am about to tell you most people will say is impossible . . . . The only reason I contacted her 2 months ago was to share a telepathic experience with her." The March 2010 letter then purports

---

[1] All further statutory references are to the Code of Civil Procedure unless otherwise noted.

[2] Bettinger apparently believed Cooper received his December 28, 2010 letter on January 5, 2011, but Cooper indicated she received it on December 30, 2010.

2

to describe Cooper's thoughts and responses while reading the first letter until "the link was broken," including Cooper thinking "He was here the whole time" based on his address, getting "very mad" when she got to the part about his lack of a cell phone, thinking "this is eerie" twice, and how she "spun around and faced South—toward me— (as I gave her 2 locations to direct her energy – my home and work)." The letter then states that Bettinger "was going to write about a week later, but [Cooper's] anger gave me a headache for 2 weeks. Then I was embarrassed for another month."

The March 2011 letter also talks about how Bettinger was "representing myself with thought" and wanted Cooper "to experience E.S.P." He notes that "If you were there that day, you know all of this is true. This is not a trick." The letter states that his first telepathic experience was in 1977 and that he started talking to Cooper about the mind before he last saw her in "June 1980."[3] Bettinger describes his December 2010 letter as "lousy" but explains that "I wrote it that way on purpose. First, I showed respect, then I create a mystery so I could hear her thoughts. Even the stamp was put on wrong on purpose."[4] The letter again expresses a desire to talk to Cooper and "hear her voice again without the anger" but claims "I will not contact Shelley any more" and ends stating that "It is her choice." Cooper did not call Bettinger. She spoke to a Gardena police officer who advised her not to respond or contact Bettinger.

In a six-page letter dated June 1, 2011, Bettinger again contacted Cooper. This letter to Cooper was enclosed with a cover letter for a "Staff Member" and another $20 "for your time," asking the staff member to give Cooper the enclosed letter and acknowledging, "Yes, I know I said I wouldn't contact Shelley again, but after her TV show[5]—this is too important. Shelley is to Jewelry what the Beatles are to Music." The

---

[3] According to Cooper, she had no contact with Bettinger between 1970 and 1980; she and Bettinger were acquaintances in middle school from 1968 to 1970.

[4] A copy of the envelope for the December 28, 2010 letter is in the record. It is unclear what was "wrong" with the stamp.

[5] Cooper appeared on a home shopping channel as a vendor guest.

3

enclosed letter[6] to Cooper starts: "I saw your show *and I cried my eyes out*. Not only was it really you, but your jewels were so beautiful. I was in shock. . . . . I tried to work the next day, but I ended up breaking down and drove home, got a bottle of whisky *and cried until I passed out*. I can't believe what I've done. My first letter was so immature and ridiculous that I thought you would see through it."[7] He then tells Cooper that "Fourteen and Fifteen year old Eric wanted to tell you he loves you, so for his sake, I'm telling you now I still have love for you." The letter goes on to explain, "I'm not just saying that because you are a famous jewelry designer, but because I've been telling my best friend/girlfriend Sherry for 25 years that she replaced you." The letter claims that Bettinger and Cooper "used to talk for hours and if we have nothing in common at 55, I will go away on my own." The letter then states: "I still need to know what happened between June 1980 and 1987. You were in Chicago? . . . I lost track of you, but my God I never, ever forgot you." Bettinger then recounted his memories from their childhood, including when Cooper kissed Bettinger on the cheek as a thank you, telling her "I wonder if you remember that, because I sure do. It still means a lot to me over 40 years later."

The June 1, 2011 letter, also discusses Bettinger's anger at himself for missing by two weeks Cooper's jewelry showing nearby in September 2010, explaining "I googled your name while I was looking for jewelry stores in October." Apparently Bettinger believed that if he had seen Cooper in person rather than writing his first letter, "This whole mess I made would have been avoided. I am begging you for one more chance." Bettinger also describes how after January 5, his "karma was so bad" and people were yelling at him—including his boss, his brother and strangers—leading him to wonder

---

[6] The envelope for the enclosed letter has Cooper's name and in parentheses below her name says: "Personal and Private" and, on the next line, "Business and Pleasure."

[7] The italicized portions of the quotation are scratched out and illegible in the copy of the June 1, 2011 letter provided in appellant's appendix; respondent's appendix has a copy of the letter that is unaltered.

what he had done. He concluded, "I have angered the GODS. I was just trying to prove clairvoyance. I've had no training. And until then I have never inten[t]ionally initiated it. Which brings me to the question I've been trying to ask for 5 months. Did it happen?"

Bettinger's June 1, 2011 letter, then describes an event that "changed his life." The letter details how Bettinger was in a bar in 1985 with his back to the four-woman band that was performing when "a feeling came over me. Really strong feeling– Someone on stage is gay. It was powerful and I turned around and saw an aura–an almost magnetic aura around one of the girls and I knew she was gay and I was seeing her love for her girlfriend. That was it for me! It was my second psychic/telepathic experience and I was hooked." The letter then describes making friends with the girls in the band and how, "although our friendship of course is all platonic, Sheila, the one I saw the aura around told me about 3 years ago she loved me. That was so special. She changed my life in 1985." After telling Cooper he is writing songs and telling her to visit his YouTube account, Bettinger tells Cooper, "Now You have changed my life after my experience on Jan. 5. I bought a computer, learned Movie Maker in a few weeks and posted You-Tube. I also have E-Mail." After giving his email address, the letter continues: "Please Shelley, acknowledge my existence. I set up the E-mail just so you could answer this letter."

The next page of the June 1, 2011 letter, talks of Bettinger's plan to have a party possibly on March 24, Cooper's birthday, or another date "for all the women born in March–It's a women's party and almost everyone is a musician." Bettinger then offered to buy $600 of Cooper's jewelry to give as gifts to "my favorite girls at the party." Bettinger suggests that Cooper would be anonymous at the party and would see the reactions of the recipients, explaining "[i]f your jewelry can make me cry, [t]hen what will it do for these women?" At the end of the party, Bettinger suggests Cooper could hand out her business cards to increase her future sales, stating "[t]he gay community needs to see and buy your beautiful jewelry."

5

On the sixth page of the June 1, 2011 letter, Bettinger apologizes for the way he "presented [him]self in January," tells Cooper she is a beautiful and wonderful person who did not deserve his "shenanigans," and asks Cooper to accept his apology and to think about his "win-win-win" offer to her. The letter concludes, "I know you are busy. Please show me some form of friendship. I still believe we have a lot in common. I have many stories, Lots of wierd [*sic*] stuff happened in Israel." Bettinger then ends the letter with the closing, "Love You Forever, Eric." Cooper did not respond to the letter.

Two weeks later, on June 15, 2011, Bettinger called Cooper's store purportedly to order jewelry, but the internet marketing person who took the call thought it was strange because he did not have any particular items in mind to order and did not process the order.

Five days later, on June 20, 2011, Bettinger sent Cooper an online email to her store's email address: "Shelley. Can I ever meet you for coffee? Eric." Cooper did not respond to the email.

The next day, on June 21, 2011, Cooper, acting in pro. per., filed a request for a restraining order, listing Bettinger's communication and attaching his letters.[8] Cooper explained that Bettinger was sending letters "with rambling explanation of his reason for contacting me, his 'para-normal' abilities to know my action and what I'm thinking." Cooper explained that Bettinger went to junior high with her and was a childhood neighbor with whom she had had minimal contact from 1968 to 1970. Cooper also explained that Bettinger's letters stated that he would stop attempting to contact her if she did not respond: she did not respond and thought the harassment would end. Instead, the "attempts to contact me are escalating from letters to email to telephone contact in my office." Cooper was "now annoyed and frightened due to the weird content of the letters and the continued attempt to make contact."

That same day, June 21, 2011, the court issued a temporary restraining order.

_____

[8] The request also sought to protect Cooper's mother who still lived in the same house in the neighborhood Bettinger used to live in with his family and Cooper's business partner at her jewelry store.

6

Bettinger did not file an opposition.

A hearing on Cooper's request for a restraining order was held on July 15, 2011. A copy of the reporter's transcript from this hearing is not in the record.

The trial court granted Cooper's request for a restraining order on July 15, 2011. The order was effective for three years and expired on July 15, 2014. Bettinger did not appeal.

On June 2, 2014, Cooper, acting in pro. per., filed a request to renew the restraining order. In her request, Cooper asked that the order be renewed "permanently" and stated that "[m]y employees, friends and I continue to be frightened at the prospect of future harassment by this person." Cooper briefly summarized the prior harassment, describing Bettinger's letters as "irrational, deceptive, controlling and threatening. None of this is flattering or harmless; it is serious and disturbing." The renewal request noted that at the original hearing, "the judge recommended to this individual that he seek immediate mental health intervention and treatment."

On June 16, 2014, Bettinger, represented by an attorney, filed a response to Cooper's request to renew the restraining order. In his response, Bettinger asserted that he "had no contact, zero contact, with Ms. Cooper since *before* the restraining order was issued," "has had absolutely no contact with Ms. Cooper since the 3 letters written in June 2011," "sent 3 letters, and never contacted her again," and that "[i]n good faith, Mr. Bettinger voluntarily discontinued any contact with [Cooper] prior to the issuance of the restraining order." Bettinger also asserts that he has no intention of contacting Cooper now or in the future. He characterizes his past contact with Cooper as "legitimate" business offers or proposals responding to Cooper's active solicitation of the public through social media and the internet for business. According to Bettinger's response, he "stumbled across Ms. Cooper's numerous internet ads" in 2011 when searching for jewelry designers to make original jewelry for his then and current girlfriend, Sherry, using a unique stone, apparently referring to Bettinger's December 2010 letter[9] telling

---

[9] Bettinger's response does not cite to the letters.

7

Cooper "I have a meteorite I'd like you to look at." Because, according to Bettinger, they were "close high school friends and in contact until 1980,"[10] Bettinger decided to get back in touch about their mutual interest in jewelry. Apparently referring to Bettinger's June 1, 2011 letter to Cooper, stating the party "for all the women born in March—It's a women's party . . . ," Bettinger's response states he "knew that Ms. Cooper was part of the gay-lesbian community" and invited her to design gifts for, what he now characterized as, "a large gay-lesbian event that he attended each year." According to Bettinger, he merely "presented a business offer, co-mingled with reminisces of their high school years and bringing her up to date on his life in the intervening years since they last met . . . ," but Cooper, instead of responding to his business proposal, had him served with a restraining order three weeks later.

Bettinger's response claims that Cooper "used the fumbling anecdotes in his letters to represent Mr. Bettinger in a bad light, misrepresenting the facts of the case and requesting a restraining order for basically 3 letters in 2011 as 'harassing.'" Bettinger's response describes him as a "less-than-artful communicator with a slight stutter and a very naive view of the court system" who appeared at the 2011 hearing without an attorney, witnesses or evidence, only to be "laughed at in court, humiliated, unable to effectively communicate with the court because of the intense pressure he felt." Bettinger's response goes so far as to suggest that it is Cooper who is fixated on Bettinger, not the other way, citing Cooper's request for a renewal of the restraining order as "incredibl[e]" and stating "[i]n a bizarre twist, Ms. Cooper's fixation on Mr. Bettinger has become concerning. Why would a person need a restraining order for 3 letters from an old high school friend over 3 years ago?"

Bettinger's response argues that Cooper failed to provide competent evidence of a need for a restraining order, noting the lack of corroborating testimony from additional protected persons and the lack of evidence of emotional harm in the form of counseling

---

[10] In contrast, according to Cooper, Bettinger was a childhood neighbor and junior high classmate with whom she had minimal contact from 1968 to 1970.

8

or medical prescriptions. He argues that there was no reasonable probability of future acts and no credible or current threat of harassment, noting "there has been no contact in over 3 years, since before the issuance of the restraining order" and concludes that Cooper cannot meet "her burden of proof of clear and convincing evidence to establish the reasonable probability the acts will be repeated in the future." Bettinger contends the restraining order is prejudicial and punitive to Bettinger. He also argues that under section 527.6, subdivision (j)(1) the restraining order may be renewed for a duration of not more than five additional years and requested $3,500 in attorney's fees.

At the hearing on June 17, 2014, Cooper, acting in pro. per., filed a reply.[11] Cooper's reply states that she and her company have never placed internet advertisements so Bettinger's claim of "stumbling across Ms. Cooper's numerous internet ads" was not possible. Cooper argues that it was a "deception" for Bettinger to claim that he was searching for a jewelry designer for his unique stone; rather, Bettinger "researched me via the internet" and, in his March 2011 letter, he told her staff member that the "'only reason I contacted her 2 months ago was to share a telepathic experience with her.'" Cooper stated that she "found disturbing" Bettinger's "self-described behavior of not being able to go to work, drinking and crying until he passed out [citation], how his clairvoyant perception that I must be angry gave him a headache for 2 wks, preventing him from writing another letter [citation]." Cooper believed that Bettinger had a "loss of self-control and judgment that has let some long-held infatuation get out of control" after forty years without any communication. She stated that the "[t]en pages of strange assertions and pleading and attempting to get the cooperation of my staff certainly got everyone's attention. We have all been fearful, distracted and cautious as a result of his communications." Cooper challenged Bettinger's characterization of his contact as for "legitimate business purpose," instead describing it as a "pretext for Mr. Bettinger to

---

[11] Although Cooper's reply is not listed on the docket (presumably because it was not received until the renewal hearing), a copy of Cooper's reply is included in respondent's appendix; Bettinger has not disputed that he and the trial court received Cooper's reply at the hearing or its inclusion in the record.

9

contact me" and that the letters instead reflected "fantasy and a loss of self-control" giving her a "reason to fear how the situation might escalate." Cooper's reply argues that Bettinger's letters and statements at the original hearing "demonstrate that his thinking is distorted and fantastical" and the current restraining order "has checked Mr. Bettinger's unpredictable behavior." Cooper asked the court to "renew it for the longest time possible. The renewal will offer my family, employees and me much needed peace of mind that we are not vulnerable to a possible future situation or confrontation."

At the June 17, 2014 hearing on Cooper's renewal request, Cooper appeared in pro. per. and Bettinger appeared with his attorney. The trial court stated that the court had read the case file going back to the original 2011 proceedings, Bettinger's response and understood that Bettinger objected to Cooper's reply. The court noted that although Bettinger's response referred to section 527.6, subdivision (j)(1), it "did not quote the full section" and then read the second full sentence of the section: "The order may be renewed, upon the request of a party, for a duration of not more than five additional years, without a showing of any further harassment since the issuance of the original order, subject to termination or modification by further order of the court either on written stipulation filed with the court or on the motion of a party." (§ 527.6, subd. (j)(1).) After Bettinger's counsel confirmed that the court was looking at the correct section, the trial court noted that while a number of Bettinger's arguments in his response might have been valid at the original July 2011 hearing or at an appeal from the original restraining order, "we are past that stage." Instead, the case was at a renewal hearing and "this section is very clear on its face; and I've already determined that the request for renewal was timely filed, and there's really nothing else left other than to renew it and to determine the amount of time of the duration."

Bettinger's counsel then argued that Bettinger wrote some letters but there had been no contact in the last three years. The court noted that at most there was one month without contact before the restraining order required no contact and that the court at the original hearing would have considered that "slim, tiny one month of no contact." Moreover, the court noted the time to appeal the original order had expired.

10

Bettinger's counsel then argued that section 527.6, subdivision (j)(1) indicates that the court "may," but does not state the court "must" or "shall" renew the order and argued that Cooper was still required to show "clear and convincing evidence that the court should do so." Bettinger again argued that there was no "clear and convincing evidence" because Bettinger had not been to Cooper's shop or home, but the court again noted that Bettinger was simply complying with the original restraining order. Bettinger's counsel also argued that "there was really no basis for the issuance of the original order," but the trial court again noted that the time to appeal the original order had expired. Bettinger then argued that Cooper's renewal request was without any basis and offered only "some kind of flimsy emotional response that she's afraid, with no factual basis," but the trial court stated that the statute was "clear on its face" and the court found "the situation to be concerning."

Following argument, the trial court renewed the restraining order, "exactly as previously granted, with the only exception that I'm now changing the expiration date and time to 8:30 a.m. on June 17, 2019." Bettinger's counsel then stated that he believed that the section said "not more than 3 years" and the trial court again quoted the section stating "not more than 5 additional years" and pointed out that Bettinger's counsel had "agreed that that code section was correct." Bettinger's counsel responded by asking that the renewal be for one year only, but the court rejected the request and stated, "I'm using my discretion, and I'm issuing it for the 5 years."

Bettinger's counsel then argued that the order did not provide notice, because other than Cooper's business address, the order did not give the particular locations Bettinger was supposed to avoid, leading to possible inadvertent violations. The trial court stated that it had ruled and concluded the hearing.[12]

---

[12] Bettinger argued at the renewal hearing his written response should be treated as a "motion of a party" to terminate or modify the restraining order under section 527.6, subdivision (j)(1). The court did so and denied the motion. On appeal, Bettinger does not raise any alleged error based on the denial of his motion to terminate or modify the restraining order.

11

At the June 17, 2014 hearing, the court issued an order renewing the civil harassment restraining order from July 15, 2011, for five years and setting the new expiration date as June 17, 2019.

On July 10, 2014, Bettinger filed a notice of appeal.

## DISCUSSION

On appeal, Bettinger argues that the trial court erred in "mechanically" granting a section 527.6, subdivision (j)(1) renewal "merely upon timely application, leaving the only discretion to the court to determine for how long to extend." Rather, Bettinger contends Cooper was required to show evidence of a "reasonable probability of future harassment," and evidence the conduct was such as would cause a "reasonable person to suffer substantial emotional distress" under subdivision (b)(3). Because we agree that the trial court erred in not recognizing that it had the discretion whether to grant a renewal, we reverse and remand.

## I.    Renewal Under Section 527.6, Subdivision (j)(1)

Section 527.6 provides for "expedited injunctive relief to victims of harassment." (*Brekke v. Wills* (2005) 125 Cal.App.4th 1400, 1412.) The statute enables a person who has suffered harassment–defined by the statute as "unlawful violence, a credible threat of violence, or a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, or harasses the person, and that serves no legitimate purpose"— to "seek a temporary restraining order and an injunction prohibiting harassment . . . ." (§ 527.6, subds. (a)(1), (b)(1), (b)(3) & (b)(6)(A).) "The course of conduct must be such that would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress . . . ." (§ 527.6, subd. (b)(3).)

A trial court generally must hold a hearing on a section 527.6 petition within 21 days of the court's grant or denial of a temporary restraining order. (§ 527.6, subd. (g).) At the hearing, the trial court "shall receive testimony that is relevant, and may make an independent inquiry. If the judge finds by clear and convincing evidence that unlawful harassment exists, an injunction shall issue prohibiting the harassment." (§ 527.6, subd.

12

(i).)  The court need not make express findings, but rather, "the granting of the injunction itself necessarily implies that the trial court found that [the respondent] knowingly and willfully engaged in a course of conduct that seriously alarmed, annoyed or harassed [the petitioner], and that [the petitioner] actually suffered substantial emotional distress." (*Ensworth v. Mullvain* (1990) 224 Cal.App.3d 1105, 1112.)

Issuances of restraining orders as well as renewals of existing restraining orders are authorized by section 527.6, subdivision (j)(1), which states:  "In the discretion of the court, an order issued after notice and hearing under this section may have a duration of not more than five years, subject to termination or modification by further order of the court either on written stipulation filed with the court or on the motion of a party.  The order may be renewed, upon the request of a party, for a duration not more than five additional years, without a showing of any further harassment since the issuance of the original order, subject to termination or modification by further order of the court either on written stipulation filed with the court or on the motion of a party.  A request for renewal may be brought at any time within the three months before the expiration of the order."

On appeal, Bettinger contends that the trial court committed reversible error when it determined that renewal under the subdivision is "to be mechanically granted merely upon timely application, leaving only discretion to the court to determine for how long to extend."  We agree.  The statute provides that the "order *may* be renewed" (§ 527.6, subd. (j)), not that it *shall* be renewed.  Here, although the trial court properly recognized that it had the discretion to determine the length of the renewal, the trial court incorrectly concluded that it was required under the statute to grant the renewal, stating that once a timely application for renewal was filed "there's nothing else left other than to renew it and to determine the amount of time."  We hold that renewal under section 527.6, subdivision (j)(1) is not automatic; instead the trial court has discretion whether to renew the restraining order and the duration of the restraining order.

The trial court in this case stated that it had reviewed the 2011 case file.  The trial court also expressed its belief that Bettinger's behavior was "concerning" and exercised

13

its discretion to renew the order for the maximum of five years–and not for the lesser period of one year suggested by Bettinger. By doing so, the trial court implicitly found that any discretion it had should be exercised to grant the broadest protection possible to Cooper and such an exercise of discretion would have been supported by the record. (*Gonzalez v. Munoz* (2007) 156 Cal.App.4th 413, 420 ["When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court"].)

However, because the trial court incorrectly assumed it had no discretion to decide whether or not to renew the restraining order in the first place, we reverse. "All exercises of discretion must be guided by applicable legal principles, however, which are derived from the statute under which discretion is conferred. [Citations.] If the court's decision is influenced by an erroneous understanding of applicable law or reflects an unawareness of the scope of its discretion, the court has not properly exercised its discretion under the law. [Citation.] Therefore, a discretionary order based on an application of improper criteria or incorrect legal assumption is not an exercise of informed discretion and is subject to reversal." (*Farmers Ins. Exch. v. Superior Court* (2013) 218 Cal.App.4th 96, 106.) Accordingly, we reverse and remand to allow the trial court to make an informed exercise of its discretion whether to renew the restraining order in the first instance.[13]

We next address the proper standard for the trial court to apply in exercising its discretion. Generally, "injunctive relief will be denied where, at the time of the order or judgment, no reasonable probability exists of the recurrence of past acts. An injunction should not be granted as punishment for past acts where it is unlikely that they will recur." (*Donald v. Cafe Royale, Inc.* (1990) 218 Cal.App.3d 168, 184; *Scripps Health v. Marin* (1999) 72 Cal.App.4th 324, 332 ["injunctive relief lies only to prevent threatened injury and has no application to wrongs that have been completed"].) Thus, a restraining

---

[13] We express no opinion as to whether the restraining order should or should not be renewed.

14

order should be renewed only when the trial court finds a reasonable probability that the defendant's wrongful acts would be repeated in the future.[14]

In deciding to renew a restraining order under section 527.6, the trial court may rely solely on the record in the original case. Subdivision (j)(1) expressly states that the order may be renewed "without a showing of any further harassment since the issuance of the original order." Although not discussed by the parties, we note that under the version of the statute in effect prior to January 1, 2012, requests for renewal were made by filing a *new* petition under the section: "At any time within the three months before the expiration of the injunction, the plaintiff may apply for a renewal of the injunction by filing a new petition for an injunction under this section." (§ 527.6, former subd. (d).) Thus, for a renewal, the petitioner would have had to make the same showing as an original petition under the former section and the court would have been required to receive testimony at a hearing. (§ 527.6, former subd. (d).) The Legislature, however, changed the statute so that a renewal no longer involves filing a new petition–with its associated burdens of proof and hearing requirements; rather the court may now renew a restraining order "upon the request of a party, for a duration not more than five additional years, without a showing of any further harassment since the issuance of the original order, subject to termination or modification by further order of the court either on written stipulation filed with the court or on the motion of a party." (§ 527.6, subd. (j)(1).) In other words, the current statute grants the trial court discretion to renew a restraining order based on its review of the record of the past harassment underlying the

---

[14] In his reply brief, Bettinger cites for the first time *Ritchie v. Konrad*, *supra*, 115 Cal.App.4th 1275, and argues that *Ritchie v. Konrad*'s "reasonable apprehension of future abuse" standard for contested renewals of restraining orders under the Domestic Violence Protection Act (DVPA), Family Code section 6345, should apply to cases like Cooper's under the civil harassment statute. We do not find *Ritchie v. Konrad* to be applicable. "The DVPA . . . permit[s] issuance of protective orders on a different, broader basis than permitted under . . . section[] 527.6 . . . . [Citation.] Additionally, a lower level of proof is required for issuance of a protective order under the DVPA . . . . a preponderance of the evidence, rather than clear and convincing evidence." (*Gdowski v. Gdowski* (2009) 175 Cal.App.4th 128, 137.)

15

original issuance of the restraining order and without the protected party presenting any new evidence.

Indeed, it would be "anomalous to require the protected party to prove further [harassment] occurred in order to justify renewal of the original order. If this were the standard, the protected party would have to demonstrate the initial order had proved ineffectual in halting the restrained party's [harassing] conduct just to obtain an extension of that ineffectual order. Indeed the fact a protective order has proved effective is a good reason for seeking its renewal." (*Ritchie v. Konrad* (2004) 115 Cal.App.4th 1275, 1284 [discussing renewal of protective order under Family Code section 6345].) A person is expected to obey lawful court orders as this section presumes. Thus, the fact that there has been no further harassment by Bettinger since the restraining order was issued in July 2011—a fact Bettinger repeatedly highlights in his papers and at oral argument—does not affect the trial court's authority to renew the restraining order.[15]

Bettinger points out that in our decision in *R.D. v. P.M.* (2011) 202 Cal.App.4th 181 there was evidence of "post-order conduct" to support a renewal but there was no such evidence in this case. Our decision in *R.D. v. P.M.*, *supra*, 202 Cal.App.4th 181, however, is not controlling as that case involved a second request for a civil harassment restraining order after the first order expired (*id.* at p. 186), and therefore could not be "renewed" but instead had to be reissued. In that context of considering whether a second petition met the required showing that harassment is likely to recur in the future, we held that the trial court "was not limited to events that occurred after the first restraining order was entered" but could again consider the facts justifying the first, lapsed restraining order as well as any new facts. (*R.D. v. P.M.*, *supra*, 202 Cal.App.4th at p. 189.) The *R.D. v. P.M.* situation is not present here since Cooper applied for an extension of the restraining order prior to the expiration of the original order.

---

[15] While the voluntary and good faith discontinuance of harassment would support denying injunctive relief (*Cisneros v. U.D. Registry, Inc.* (1995) 39 Cal.App.4th 548, 574; *Phipps v. Saddleback Valley Unified School Dist.* (1988) 204 Cal.App.3d 1110, 1118), Bettinger's discontinuance was not voluntary as it was compelled by the original restraining order.

Finally, the trial court's decision granting the initial restraining order "necessarily implies that the trial court found that [the respondent] knowingly and willfully engaged in a course of conduct that seriously alarmed, annoyed or harassed [the petitioner], and that [the petitioner] actually suffered substantial emotional distress." (*Ensworth v. Mullvain*, *supra*, 224 Cal.App.3d at p. 1112.) Likewise, the decision necessarily implies that the court found that Cooper met the clear and convincing standard and that a reasonable person in Cooper's situation would have suffered substantial emotional distress. (§ 527.6, subds. (b)(3) & (i).) At the point where a protected party seeks a renewal of a restraining order and the restrained party has either failed to appeal—as happened in Bettinger's case—or has lost on appeal, the restrained party cannot challenge the findings and evidence underlying that original order nor the validity of that order.

## II.    Attorney's Fees

Bettinger seeks an award of attorney's fees under section 527.6, subdivision (r).[16] Cooper in her reply brief also asks for attorney's fees if she prevails. Because this decision is an interim ruling before a final resolution on the merits, it would be premature to make a prevailing party determination at this juncture. Accordingly, neither party is to recover attorney's fees on appeal.

---

[16] Subdivision (r) states: "The prevailing party in any action brought under this section may be awarded court costs and attorney's fees, if any." (§ 527.6, subd. (r).)

## DISPOSITION

The order is reversed and remanded with directions for the trial court to reconsider Cooper's request for a renewal of the restraining order. In exercising its discretion, the trial court should consider whether there is a reasonable probability that Bettinger's wrongful acts will be repeated in the future. Each party is to bear its own costs on appeal.

TO BE PUBLISHED.


CHANEY, J.


We concur:

ROTHSCHILD, P. J.


MOOR, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.