Filed 12/2/25 Certified for Publication 12/26/25 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| ROBERT W. RINKER II, | B339866 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. Nos. 24STRO03652, |
| v. | 19STFL04998) |
| CINDI RINKER, | |
| Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Dennis F. Hernandez, Commissioner. Reversed and remanded with directions.

Ben Gharagozli for Plaintiff and Appellant.

Cindi Rinker, in pro. per., for Respondent.

## INTRODUCTION

Robert Rinker appeals from the denial of his request for entry of a domestic violence restraining order (DVRO) against his ex-wife, Cindi Rinker.[1] He contends the trial court failed to apply the proper legal standard for abuse and therefore abused its discretion. We agree. We therefore reverse the court's order and remand with directions to the trial court to enter the DVRO.

## BACKGROUND

### I.    Prior Proceedings

Robert and Cindi were married in 2014. They have one child, son W., born in 2015. Robert filed a petition for dissolution of marriage in April 2019, seeking full custody of W. He also requested a temporary emergency order granting him full custody of W., based on Cindi's recent psychiatric hospitalization "following her attempt to overdose on her Prozac medication." The court denied the emergency request.

The family was referred to the Los Angeles County Department of Children and Family Services (DCFS) in 2019 based on allegations by Cindi that W. had been sexually abused by his paternal grandfather (grandfather). DCFS ultimately determined those allegations were inconclusive. In November 2019, DCFS filed a petition in juvenile court alleging that W. was at risk of harm due to Cindi's mental and emotional problems, including a diagnosis of psychosis, paranoid and erratic behavior, and suicidal ideation. DCFS cited Cindi's April 2019 suicide attempt and subsequent hospitalization. Cindi told DCFS that she was not trying to kill herself, rather, she had accidentally overdosed on Prozac. She admitted having depression and anxiety but denied other mental health issues.

In November 2019, Robert reported an incident where Cindi was acting paranoid, claiming that people were chasing her and driving erratically late at night with W. in the car. She refused to cooperate with Robert or with police, leading to her detention and a second hospitalization. In December 2019, Cindi began to see a psychiatrist and started taking medication for her mental condition.

---

[1]    We refer to the parties by first name for clarity.

In January 2020, the juvenile court ordered joint legal custody of W. and sole physical custody to Robert, with monitored visitation to Cindi. The juvenile court also terminated jurisdiction over the matter. In August 2020, the family court entered a judgment of dissolution. The parties agreed to a stipulated judgment, including joint legal custody of W. and primary physical custody to Robert, with monitored visitation by Cindi, with increased visitation as approved by Cindi's psychiatrist. In April 2022, the parties entered into a stipulated order allowing Cindi unmonitored visitation.

## II.    DVRO Petition

In May 2024, Robert filed a request for DVRO against Cindi. He alleged ongoing abuse by Cindi since December 2023 that was "progressively getting worse." He also requested a return to professionally monitored visitation for Cindi due to reoccurring issues with her "severe and untreated mental health issues."

Robert also filed a declaration outlining his allegations of abuse. He stated that Cindi's conduct included sitting in her car outside of his home at all hours of the night and ringing his doorbell incessantly, refusing to leave, even after he threatened to call the police. He stated that Cindi's conduct had worsened over the past six months and she was "now stalking us almost daily," putting him in fear for his and W.'s safety. He further stated that Cindi sent him threatening communications after he refused to communicate with her. According to Robert, he had agreed to unmonitored visitation for Cindi in mid-2021 after her mental health had stabilized. This arrangement continued successfully until late 2023, when Cindi "fell back into some sort of delusional mental state and began stalking and following me incessantly as well as harassing me via text and calls."

Robert detailed multiple specific instances of Cindi's alleged abuse. In December 2023, Cindi followed Robert and W. home and entered the residence without permission, refusing to leave for two hours. She also made accusations toward Robert's parents and grabbed Robert's father by the shirt. W. was present and yelled for Cindi to stop. Ultimately, Robert left with W. and stayed at a hotel.

On March 29, 2024, Cindi followed Robert home and rang his doorbell

3

repeatedly.  She refused to leave despite his requests that she do so.  In early April, Cindi picked W. up from school without notice to Robert.  According to W., she was recording him, taking pictures of his body, and asking questions about injuries and scratches.  She asked W. if Robert was taking care of him and disparaged Robert to the child.

On April 29, 2024, Robert and W. were at home sick.  Cindi began texting him incessantly and threatened to call in a welfare check on W.  She parked in Robert's driveway and refused to leave until W. came out and spoke to her.  When Robert blocked her text messages, she began texting his parents.

In early May 2024, Robert detailed several instances in which Cindi followed Robert and W. to various outings to which she was not invited, outside of her agreed visitation time with W.  In one instance she tried to gain access to the home of a friend where they were spending the afternoon, and then began video recording, asking W. questions, and making accusations about Robert being with other women.  Another time, she called Robert repeatedly from several phone numbers, then appeared at a dinner she had agreed not to attend.  After Robert left, she texted him "It is not my fault you follow the devil instead of God."

On May 11, 2024, Cindi got into Robert's car with Robert and W. without permission and refused to leave.  Robert stated that W. was scared of his mother.  Cindi then followed them in her car, pulling up next to Robert's car and threatening to send someone to "inspect" W. and ensure there were no scratches on him.

On May 17, 2024, Robert alleged that Cindi followed him and W. in her car despite his texts requesting that she stop.  She also threatened to message his boss.  That evening, Cindi rang his doorbell incessantly, ignoring his requests that she stop and leave.  She then sat in her car outside his house for hours and continued to call and text him.

At 5:30 the following morning, Robert left home to drive W. to a soccer tournament.  Cindi followed him from his neighborhood onto the freeway.  Once on the freeway, she "sped up" to pull alongside his vehicle, signaling him to call her.  Robert exited the freeway to try to lose her, but when he got back on, he saw Cindi had pulled onto the freeway shoulder.  She "continued

4

to chase after me," and texted that she would pay his parents a visit. Robert attached copies of some of these texts to his declaration as well as evidence of repeated phone calls, and photos and videos purporting to show Cindi at his door and following his car.

The court granted a temporary restraining order against Cindi on May 23, 2024, protecting Robert and W. until the scheduled hearing the following month. The court retained Robert's sole custody over W. and ordered monitored visitation for Cindi.

## III. Cindi's Response

Cindi filed a response in propria persona, objecting to the request. She denied each of the incidents Robert alleged. She contended that she was fearful for W.'s safety due to past incidents of sexual abuse by grandfather and physical abuse by father, and explained that she often attempted to "stay nearby" to W. so that she could check on him to ensure he was safe. She stated that her mental health had been "deeply affected" by past abuse toward W. and Robert's domestic violence toward her and she had "sought help from therapists."

## IV. DVRO Hearing and Ruling

Both parties appeared in propria persona and testified at the hearing on June 13, 2024.

### A. Robert's Testimony

Robert discussed the December 2023 incident when Cindi followed them into the house and refused to leave despite his repeated requests. He testified he was fearful because she was "acting in a very erratic and dangerous manner." Cindi began recording grandfather with her phone, he grabbed the phone, and they scuffled as she tried to get it back. Robert stated that Cindi grabbed grandfather's shirt and was "out of control," and he had to "step in and break it up."

Robert also testified that the evening before she followed him on the freeway, she rang his doorbell incessantly. Later that evening, the community watch program reported someone matching Cindi's description and car parked near his house for several hours. Early the following morning, as he drove W. to a soccer tournament, Cindi followed him from his neighborhood and onto the freeway. On the freeway, Cindi pulled next to

5

him, signaled for him to call her, and tried to "force me to pull over." He explained that he was afraid because "when she follows me it gets very erratic," and that W. was also afraid. In response to questioning by the court, he confirmed that she was driving erratically, stating that she "raced up behind me. And she got very close to my bumper. When I didn't stop, she pulled up around side of me signaling me to stop." He explained that he had evidence of multiple instances of Cindi ringing his doorbell, refusing to leave, and then calling and texting "frantically."

Robert also highlighted other incidents in May where Cindi followed him home and rang the doorbell incessantly. She also threatened to contact his boss, as shown in his text messages from that date. Robert stated that Cindi had in fact contacted his work in the past and said, "not so nice things." He also noted the incident when she got into his car without permission and refused to leave. Robert testified that W. was scared and the child asked her to get out of the car. He outlined other instances where Cindi recorded W. playing with friends outside, followed Robert and W. to social events to which she was not invited, and threatened to send someone to the house to inspect W. or to harass Robert's parents.

The court stated that Robert's "allegation is principally the stalking allegation," rather than threats to do harm. Robert told the court that he was requesting monitored visits until Cindi's behavior was more stable and her paranoia was controlled. Robert explained that he wanted Cindi and W. to have a relationship, but the child had not asked to see Cindi because he "doesn't feel safe." W. told Robert, "I don't want mommy following us. I don't want her asking me questions." Robert noted that W. was affected by Cindi's conduct and had begun to have anxiety.

**B.    Cindi's Testimony**

Cindi provided documents and testified as to her current mental health status, which she contended was "stable."[2] Regarding Robert's allegations,

---

[2]    It appears that the documents Cindi submitted to the trial court, including letters from mental health providers, are the same documents she has included in her respondent's appendix on appeal. As such, we grant Cindi's unopposed request to submit an undated Respondent's Appendix containing these records. However, Cindi has also included new evidence in

6

she acknowledged that she "went to his house many times. Yes. And he didn't open the door many times. Yes." She also admitted that she would knock and then refuse to leave when he asked. She contended that Robert stopped communicating with her and she could not schedule her visits with W.

She acknowledged that on the day she followed them on the freeway, it was not her scheduled visitation time. She testified that she was following Robert to confirm that he was taking W. to his soccer tournament. She then continued to follow him so that she could attend the tournament.

The court also questioned Cindi about her mental condition, noting that her evidence suggested she was receiving treatment for an adjustment disorder. The court asked whether Cindi's condition manifested in "obsessive behavior," such as the behavior Robert alleged, and whether "you think those are as a result of any current medical condition that you're suffering from?" Cindi responded that she did not. She then agreed with the court's summary of her position that "whatever condition that you've been suffering in the past, they're [*sic*] being addressed by therapy. And that at the present time . . . you're not exhibiting any symptoms related to your adjustment disorder." In response, Robert again noted Cindi's past hospitalizations and evidence of paranoid tendencies and stated that he was scared because Cindi's behavior had "taken a very drastic turn over the last several months."

### C.    Court's Findings and Order

The court noted the "serious consequences" of issuing a DVRO. It stated that Robert had "certainly presented evidence related to the stalking. But I guess the question really is, is this kind of circumstance arising from a medical condition that can be addressed in way [*sic*] other than this court issuing a restraining order."

---

her respondent's brief, such as photographs of W. and statements regarding events occurring after the hearing at issue. There is nothing in the record to establish that this evidence was before the family court at the time it made the ruling at issue, and therefore we cannot consider it. (*Reserve Insurance Co. v. Pisciotta* (1982) 30 Cal.3d 800, 813 ["It is an elementary rule of appellate procedure that, when reviewing the correctness of a trial court's judgment [or order], an appellate court will consider only matters which were part of the record at the time the judgment was entered."])

Finding "abuse" as defined in Family Code, section 6320,[3] "[Cindi] has acknowledged that she has a medical condition that is identified as adjustment disorder. And that it is being treated via therapy. The condition is under control. And is [*sic*] not currently suffering from any such circumstances." The court concluded that Robert's allegations "primarily relate to conduct where the respondent is seeking to have additional time with their child. . . ."

The court found that the evidence Cindi was following Robert was "inconclusive. As far as this court's concerned, at least there's not preponderance of the evidence, that the stalking via following on the freeway was an intentional attempt to threaten or otherwise intimidate [Robert]. The testimony was to the effect they were going to a tournament and in different vehicles." Addressing Cindi, the court stated, "it's clear that you have some issues you need to deal with. And you need to stay in therapy. You need to address those issues."

The court stated it was denying the DVRO for the moment, but cautioned that "if anything like this happens in the future, that [Robert] is welcome to come back to this court and ask for a restraining order because what he has identified is clearly obsessive behavior. [¶] Behavior that may well be a result of [Cindi's] medical condition and may well manifest itself in different ways." The court additionally cautioned Cindi, "it's clear that you need some medical attention," and advised her to address her issues "before they manifest themselves in ways that do, in fact, constitute abuse." The court told Cindi that "it sounds like much of the conduct here seems to arise from your condition. And it's up to you as a responsible adult to get control of that. Mr. Rinker has every reason to be concerned for . . . your son's welfare because he sees what's going on. And it affects him too in significant ways."

Robert also requested that the court order monitored visits for W.'s safety. The court agreed that "the conduct is sufficiently alarming" and ordered professional monitoring for W.'s visits with Cindi.

Robert timely appealed.

---

[3]     All further undesignated statutory references are to the Family Code.

8

## DISCUSSION

I. **Legal Principles**

    A. **DVRO**

The Domestic Violence Prevention Act (DVPA) (§ 6200 et. seq.) permits the trial court to issue a protective order "to restrain any person for the purpose of preventing a recurrence of domestic violence and ensuring a period of separation of the persons involved" upon "reasonable proof of a past act or acts of abuse." (§ 6300.) "Abuse" under the DVPA includes bodily injury (§ 6203, subd. (a)(1)); reasonable apprehension of serious bodily injury (§ 6203, subd. (a)(3)); and "behavior that has been or could be enjoined pursuant to Section 6320" (§ 6203 subd. (a)(4)).

Section 6320 in turn permits an order enjoining, in relevant part, a party from "molesting, attacking, striking, stalking, threatening, . . . harassing, telephoning . . . contacting, either directly or indirectly, by mail or otherwise, . . . or disturbing the peace of the other party." (§ 6320, subd. (a).) The DVPA further defines "disturbing the peace of the other party" as "conduct that, based on the totality of the circumstances, destroys the mental or emotional calm of the other party. This conduct may be committed directly or indirectly, . . . and by any method or through any means including, but not limited to, telephone, online accounts, text messages, internet-connected devices, or other electronic technologies." (*Id.*, subd. (c).) This includes "coercive control, which is a pattern of behavior that in purpose or effect unreasonably interferes with a person's free will and personal liberty. Examples of coercive control include, but are not limited to, unreasonably engaging in any of the following. . . . [¶] Controlling, regulating, or monitoring the other party's movements, communications, daily behavior, finances, economic resources, or access to services." (*Ibid.*)

The DVPA requires a showing of past abuse by a preponderance of the evidence. (*In re Marriage of Davila and Mejia* (2018) 29 Cal.App.5th 220, 226; see also *Cooper v. Bettinger* (2015) 242 Cal.App.4th 77, 90, fn. 14.) The trial court must consider "the totality of the circumstances" in determining whether to grant or deny a DVRO. (§ 6301, subd. (d).)

### B. Standard of Review

We review the grant or denial of a request for a DVRO for abuse of discretion. (*Rodriguez v. Menjivar* (2015) 243 Cal.App.4th 816, 820 (*Rodriguez*); *In re Marriage of Nadkarni* (2009) 173 Cal.App.4th 1483, 1495 (*Nadkarni*).) However, "the exercise of discretion is not unfettered in such cases." (*Nakamura v. Parker* (2007) 156 Cal.App.4th 327, 337 (*Nakamura*).) An exercise of discretion must be guided by applicable legal principles, "which are derived from the statute under which discretion is conferred. [Citations.] If the court's decision is influenced by an erroneous understanding of applicable law or reflects an unawareness of the full scope of its discretion, the court has not properly exercised its discretion under the law. [Citation.] Therefore, a discretionary order based on an application of improper criteria or incorrect legal assumptions is not an exercise of informed discretion and is subject to reversal." (*Rodriguez, supra*, 243 Cal.App.4th at p. 820, quoting *Eneaji v. Ubboe* (2014) 229 Cal.App.4th 1457, 1463.)

Whether a trial court applied the correct legal standard to an issue in exercising its discretion is a question of law, requiring de novo review. (*Rodriguez, supra*, 243 Cal.App.4th at p. 821, citing *Gonzalez v. Munoz* (2007) 156 Cal.App.4th 413, 420–421.) "'To the extent that we are called upon to review the trial court's factual findings, we apply a substantial evidence standard of review.'" (*In re Marriage of Davila and Mejia* (2018) 29 Cal.App.5th 220, 226, quoting *In re Marriage of G.* (2017) 11 Cal.App.5th 773, 780.) We "view the whole record in a light most favorable to the judgment, resolving all evidentiary conflicts and drawing all reasonable inferences in favor of the decision of the trial court." (*Melissa G. v. Raymond M.* (2018) 27 Cal.App.5th 360, 373–374.)

## II. Analysis

Robert argues the trial court did not properly consider all of his evidence of abuse when denying his request for a DVRO. Instead, he contends the court narrowly focused on whether Cindi's "obsessive" conduct was intentionally threatening or intimidating, or whether it was caused by her mental disorder. The record of the hearing supports his contention that the court did not correctly apply the standard of abuse under the DVPA.

The DVPA includes a wide category of abusive conduct which we broadly construe in order to accomplish the purpose of the statute. (See *Nadkarni, supra*, 173 Cal.App.4th at p. 1498 [finding DVPA has a "protective purpose" that is "broad both in its stated intent and its breadth of persons protected"]; *Nakamura, supra*, 156 Cal.App.4th at p. 334.) The statute expressly encompasses not just physical abuse, but also stalking, harassing, telephone contact, and conduct that "disturb[s] the peace of the other party," which includes acts of coercive control, such as "monitoring the other party's movements." (§ 6320, subds. (a), (c).)

At the hearing, the court found Robert had presented evidence of Cindi's "clearly obsessive behavior," as well as "evidence that may well constitute stalking" as demonstrated by her "incessant following, knocking on doors, coming to the house, and refusing to leave after numerous requests." However, the court concluded that Robert had not met his burden of proof to establish abuse, remarking that he had not shown by a preponderance of the evidence "that the stalking via following on the freeway was an intentional attempt to threaten or otherwise intimidate" him.

The court's limited interpretation of the conduct included in the DVPA was error. For example, in *Nadkarni, supra*, 173 Cal.App.4th at pages 1488–1489, the appellant sought a DVRO to restrain her ex-husband from using information he obtained after accessing her email account. The ex-husband had already attached emails to family court filings and the appellant feared that he would continue to use the emails "to control, harass, and abuse" her. (*Id*. at p. 1492.) The trial court denied the application, finding that while the ex-husband's "conduct may very well be illegal, . . . I don't think that it rises to the level of conduct that is amenable to the Domestic Violence Prevention Act." (*Id*. at p. 1493.) The appellate court reversed. The court found that the "plain meaning of the phrase 'disturbing the peace' in section 6320 may include, as abuse within the meaning of the DVPA, a former husband's alleged conduct in destroying the mental or emotional calm of his former wife by accessing, reading and publicly disclosing her confidential emails." (*Id*. at p. 1498; see also *Perez v. Torres-Hernandez* (2016) 1 Cal.App.5th 389, 398–399 (*Perez*) [respondent's post-breakup phone calls and texts, despite petitioner's requests that they stop, were a disturbance of petitioner's peace

11

and therefore abuse under DVPA]; *Burquet v. Brumbaugh* (2014) 223 Cal.App.4th 1140, 1146 [unannounced and uninvited visits and repeated contacts by phone, e-mail, and text, despite requests of no contact, "disturb[ed] the peace" and constituted abuse].)

Indeed, as this court previously explained, "[t]he law does not permit courts to make a distinction between physical and non-physical abuse when issuing DVROs. . . . [S]talking and other controlling behaviors are more than just useful predictors of future physical harm. They cause significant psychological damage on their own." (*G.G. v. G.S.* (2024) 102 Cal.App.5th 413, 425 (G.G.).) In *G.G.*, the issue before the court was whether to renew a DVRO. The court (the same judicial officer who presided in this case) denied the petition, finding that the petitioner had presented "evidence of stalking" but not "intentional causing of fear" by the respondent. (*Id.* at p. 424.) This court reversed, finding that the trial court's decision "was predicated on the absence of intentional violations of the initial order. Use of such a narrow focus prevented the court from exercising its discretion." (*Id.* at p. 427, citing *Perez, supra*, 1 Cal.App.5th at p. 398.)

The trial court employed a similarly narrow focus here and therefore failed to appropriately exercise its discretion when considering the totality of the circumstances. The court's comments indicate that it largely found Robert credible, but it nevertheless ignored his evidence of Cindi's escalating behavior, including relentless calling, texting, and ringing his doorbell, waiting in his neighborhood for hours, following and/or chasing him in her car while driving erratically, entering his home and car without permission and refusing to leave, and threatening to harass his work and parents if he did not comply with her demands. Robert testified repeatedly that this conduct scared him and W. He also provided support for his testimony with copies of text messages, phone logs showing missed calls, photos and videos. Additionally, although she testified as to a more innocuous motive, Cindi did not dispute much of her behavior alleged by Robert, including that she repeatedly called and texted him, came to his home and rang the doorbell, refused to leave when asked, and followed him in her car.

Although the court recognized that Cindi's conduct affected Robert and W. in "significant ways," it nevertheless found the conduct did not rise to the

12

level of abuse. The court's findings that Robert had established Cindi's obsessive behavior and stalking, which significantly affected Robert and his child and were "sufficiently alarming" to require professional monitoring for her visitation, are contrary to its finding that there was insufficient evidence of abuse under the DVPA. Instead, the court focused on Cindi's intent, as reflected in its questioning and comments regarding whether Cindi's conduct was caused by her mental condition and its admonition that she continue to seek treatment. As it had in *G.G., supra*, 102 Cal.App.5th at p. 427, the court erroneously relied on its finding that Cindi did not have a malicious intent and ignored the substantial evidence of her conduct that qualifies as abuse under the DVPA. Notably, Robert presented evidence of Cindi's abusive conduct for the six months prior to the DVRO hearing, including less than a month before the hearing.

Robert was not required under the DVPA to show that Cindi intended to threaten or intimidate him. (*G.G., supra*, 102 Cal.App.5th at p. 427.) Nor was he required to establish a probability of future abuse, as section 6300 permits the court to issue a DVRO upon "reasonable proof of a past act or acts of abuse." (*Nevarez v. Tonna* (2014) 227 Cal.App.4th 774, 783; see also *Nakamura, supra*, 156 Cal.App.4th at p. 334 ["A trial court is vested with discretion to issue a protective order under the DVPA simply on the basis of an affidavit showing past abuse"].)

By misapplying the applicable law when deciding whether to issue a DVRO, the trial court abused its discretion. (*Rodriguez, supra*, 243 Cal.App.4th at p. 820.) Moreover, the court failed to properly consider the totality of circumstances. Indeed, apart from its consideration of Cindi's mental state, the court did not identify any countervailing evidence that would weigh against the DVRO. As such, based on largely uncontradicted evidence of past abuse, which the court found to be "alarming," the evidence presented at the hearing permitted only one reasonable conclusion—Robert met his burden of proof for entry of the DVRO. We therefore reverse the order.

## DISPOSITION

The order denying Robert's application for a DVRO is reversed. The matter is remanded to the trial court with directions to grant Robert's

application and enter the DVRO requested.  The parties shall bear their own costs on appeal.

COLLINS, J.

We concur:

ZUKIN, P. J.

TAMZARIAN, J.

Filed 12/26/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| ROBERT W. RINKER II, | B339866 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. Nos. 24STRO03652, 19STFL04998) |
| v. | |
| CINDI RINKER, | ORDER CERTIFYING OPINION FOR PUBLICATION |
| Respondent. | |

*THE COURT:

The opinion in the above-entitled matter filed on December 2, 2025 was not certified for publication in the Official Reports. Upon application of interested party Family Violence Appellate Project (FVAP) and for good cause appearing, it is ordered that the opinion shall be published in the Official Reports.

*ZUKIN, P.J.             COLLINS, J.             TAMZARIAN, J.